PER CURIAM.
The State of Alabama appeals from two orders of the Macon Circuit Court dismissing the State’s petition for forfeiture of certain electronic-gambling devices and related records and currency located at Vic-toryLand casino (appeal no. 1141044). We reverse both orders and render a judgment for the State in appeal no. 1141044. KC Economic Development, LLC (“KCED”), cross-appeals (appeal no. 1150027). We dismiss KCED’s cross-appeal as moot.

I. Facts and Procedural History

On February 15, 2013, in Ex parte State of Alabama, 121 So.3d 337, 340 (Ala.2013), *821 this Court issued a writ of mandamus ordering Circuit Judge Tom F. Young, Jr., to issue a search warrant “as to certain allegedly illegal gambling devices and related items” located at the VictoryLand casino in Shorter. The warrant was issued the following day and was executed on February 19, 2013. During the search pursuant to the warrant, the State seized 1,615 gambling machines, $263,105.81 in currency,[1] and related servers, terminals, and other equipment. On February 25, the State filed in the Macon Circuit Court a “Petition for Forfeiture and Condemnation” of the items seized. See § 13A-12-30, Ala. Code 1975 (providing for forfeiture to the State of unlawful gambling devices, records, and money “used as bets or stakes” in unlawful gambling activity). The petition named Macon County Greyhound Park, Inc. (“MCGP”), and KCED as the persons found in possession of the seized property.[2]
On August 23, 2013, this Court, in response to a petition filed by the State, issued a writ of mandamus disqualifying Judge Young from presiding over the forfeiture proceeding. Ex parte State (In re State v. $223,405.86 U.S. Currency et al.) (No. 1120757). All the other eligible judges in the Fifth Judicial Circuit, which includes Macon County, voluntarily recused themselves. On November 12, 2013, Montgomery Circuit Judge William Shashy was appointed to preside over the case. On December 9, 2013, Judge Shashy scheduled a bench trial for June 3, 2014. The trial date was extended for three months at the request of the parties. On September 9-12, 2014, Judge Shashy conducted a four-day bench trial. The State’s witnesses testified about the characteristics of the seized machines, which the State argued were illegal gambling devices. Witnesses for KCED testified that the intent of the voters who in 2003 ratified Macon County’s “bingo amendment,” Local Amendment, Macon .County, § 1, Ala. Const. 1901 (Off.Recomp.) (“Amendment No. 744”) was to legalize the very types of devices that had been seized. Nine months later, on June 25, 2015, Judge Shashy entered an order dismissing the forfeiture action on equal-protection grounds, i.e., on the basis that the State tolerated at other locations in Alabama the operation of casinos that used the same type machines at issue in this forfeiture case. The order did not address the issue of the legality of the machines.
On July 7, 2015, KCED filed a post-judgment motion requesting that the trial court specifically find that the intent of the voters in approving Amendment No. 744 was to authorize the use in Macon County of electronic-gambling machines like those allegedly available at other locations in the State. KCED additionally requested that the trial court order that all the seized property be returned. The State, also dissatisfied with the court’s order, disagreed that it had selectively enforced Alabama’s gambling laws and contended that the equal-protection rationale was legally untenable. The State also argued that under settled Alabama law the seized machines were illegal gambling devices and thus contraband. KCED filed a rebuttal to the State’s response, which included two affidavits from individuals who attested that they had visited casino locations in Alabama subsequent to the trial .court’s June 15 order and found in operation electronie- *822 gambling machines just like those seized as contraband at VietoryLand.
On August 4, 2015, Judge Shashy held a hearing on the postjudgment motions. On October 2, 2015, he issued an order that provided the findings of fact sought by KCED and concluded that “the Macon County voter when voting on the amendment understood it to be all forms of bingo.” He also repeated his finding from the June order that the State of Alabama was “cherry picking which facilities should remain open or closed” and thus was “not enforcing the law equally.” Judge Shashy then entered a conditional order for return of the seized property: “Unless the State of Alabama initiates legal action and/or forfeiture proceedings within 45 days against [casinos in Greene County and Lowndes County], then all seized equipment, records, and currency shall be returned to [KCED].” The State appealed from the trial court’s orders; KCED “out of an abundance of caution” cross-appealed to preserve its claim for return of the seized property and its position that the seized machines were legal under Alabama law. To prevent the trial court’s 45-day deadline for return of property from being triggered during the pendency of the appeal, the State moved this Court to stay the order, which this Court granted on November 9,2015.[3]

II. Standard of Review

When a judge tries a case without a jury, we apply the following standard of review:
“ ‘[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.’ Philpot v. State, 843 So.2d 122, 125 (Ala. 2002). ‘“The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.” ’ Wattman v. Rowell, 913 So.2d 1083, 1086 (Ala.2005) (quoting Dennis v. Dobbs, 474 So.2d 77, 79 (Ala.1985)). ‘Additionally, the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge’s conclusions of law or the incorrect application of law to the facts.’ Id.”
Fadalla v. Fadalla, 929 So.2d 429, 433 (Ala.2005).

III. Analysis

The State challenges the trial court’s orders on three grounds: (1) that the equal-protection analysis was erroneous; (2) that the trial court’s reliance on “voter intent” to define the word “bingo” was improper; and (3) that the machines in question do not constitute “bingo” under prior decisions of this Court and therefore are contraband that is due to be forfeited. KCED cross-appeals, asking for relief in its favor beyond that ordered by the trial court.

A. Equal Protection

1. Background

The attorney for KCED began his opening statement at trial by displaying a chart entitled “Facilities in Alabama with Electronic Bingo Machines.” The chart listed the number of days five different organizations allegedly had operated electronic-gambling machines in Alabama claimed to constitute “bingo” in the preceding four years and one month. According to the chart, (1) three tribal casinos had operated such machines every day during that period and (2) two casinos in Greene County and one in Houston County *823 had been open and operating such machines for an average of 1,119 days in the same period — 75% of the time, or three years out of the four. By contrast, Victo-ryLand allegedly had operated such machines in the same period for only 68 days — 4% of the time, or two months. The chart was a demonstrative device; no evidence was offered at trial to substantiate the numbers reflected on the chart. KCED’s purpose in displaying the. chart was to show that such machines were in use in other locations in Alabama and, therefore, to argue that “Victoryland, like the other facilities in Alabama, can run the same thing so the people of Macon County can have the same thing.” KCED did not raise a formal equal-protection claim but instead relied primarily on the argument that the intent of the voters in approving Amendment No. 744 was to approve the same type of machines KCED claimed other casinos had in operation.
The trial judge seized upon the statement of KCED’s counsel that the same machines as in the forfeiture proceeding before the trial court were freely available to patrons at other locations in the State. On his own initiative, Judge Shashy raised the equal-protection issue with KCED’s counsel.
“THE COURT: Is there an equal protection claim?
“MR. JOE ESPY (KCED): Well, we may have to eventually go there. We are trying to go this other route first.”
The trial court jousted with counsel for the State about what appeared to the court to be an injustice. The State argued that it had consistently enforced the law but that certain facilities had reopened after their machines had been seized and cases were tied up in litigation.
“THE COURT: Well, I mean, it gets to equal protection to me.

a

“MR. REAGAN (STATE): But, Your Honor, we have conducted law enforcement operations at every facility and tried to be consistent with our approach to dealing with this problem. And if folks reopen, when the State is able to go in and seize machines, we do it each time.”-
The.only witness who arguably offered testimony about the equal-protection issue was Dr. Lewis Benefield, a veterinarian and the chief operating officer of KCED. He stated that during the week preceding the trial he had visited the three tribal casinos in Alabama as well as the casino at Center Stage in Houston County and had in those casinos played machines similar to those at issue in the forfeiture proceeding. No witness offered testimony to verify the numbers on the chart, which was not given an exhibit number until the end of the posttrial hearing. During closing argument, neither the parties nor the trial court mentioned the equal-protection issue. The State filed a posttrial - brief arguing that the seized machines were illegal gambling devices under Alabama law and that KCED’s “voter-intent” argument should be rejected.
The trial court’s decision in its order of June 25, 2015, dismissing the forfeiture case relied solely and exclusively on the equal-protection argument the court itself had raised during opening statements and discussed with counsel. The court rejected what it referred to as the unequal application of the law and accused the State of “cherry picking which facilities should remain open or closed.” Furthermore, the court asserted that such disparate treatment of VictoryLand violated the Equal Protection Clause of the United States Constitution, which, he stated, is “one of the cornerstones of our American system.” Noting that “Equal Justice Under Law” was “etched into the facade of the United *824 States Supreme Court Building,” the trial court quoted the statement of that Court that “ ‘all persons similarly, circumstanced shall be treated alike.’ ” Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (quoting F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)). The trial court then stated that it would apply that principle to the case before it:
“Applying this rationale, all facilities operating the same type bingo machines (Center Stage, Greenetrack and Greene Charity Bingo) should have the same forfeiture action applied against them each time there is a violation. This has not been done. At the present time, the facilities at Center Stage, Greenetrack and Greene Charity Bingo are open for business. VictoryLand remains closed.”
The trial court then reasoned:
“This Court is not free to disregard an opinion of the highest court of the United States of America or the State of Alabama, nor is the State of Alabama free to apply the law in an unequal manner. Allowing unequal treatment places the Court in an untenable position. The Court cannot condone or perpetuate unequal treatment.”
The court’s order concluded with the statement of United States Supreme Court Justice Lewis F. Powell, Jr., that equal justice under the law “is perhaps the most inspiring ideal of our society.... It is fundamental that justice be the same, in substance and availability....”[4] “For the foregoing reasons,” the trial court stated, “this case is hereby DISMISSED.” (Capitalization in original.)
The trial 'court’s order, which ignored four days of trial testimony and the issues raised by the parties, apparently disturbed both sides; their postjudgment motions requested the court to rule on the issues actually raised at trial. KCED requested a finding that the intent of the voters who ratified Amendment No. 744 was “to allow all forms of bingo games ... including electronic bingo as played on the equipment at issue in this case.” The State denied that it had selectively enforced the law. Noting that “KCED never made an equal protection clause argument,” the State requested that the court withdraw its order and address the merits of the State’s assertion that the machines seized from VictoryLand were illegal under Alabama law.
On August 4, 2015, the court held a hearing on the posttrial motions. The State objected to the trial court’s basing its ruling on conversations with counsel and a chart that was never admitted into evidence. The State also objected on timeliness grounds to two affidavits offered by KCED at the hearing in which recent visitors to local casinos stated that they had seen machines at those casinos identical to the machines seized from Vic-toryLand. Primarily, however, the State implored the trial court to rule on the issue before it: whether the machines that had been seized at VictoryLand were law *825 ful in Alabama. The trial court refused to do so because of its concern about equal enforcement of the gambling laws. The following colloquy took place between the trial court and counsel for the State:
“THE COURT: You know, I have a hard time — people are going to lose faith in you guys; they are going to lose faith in the court system because you’re only going after one.
“MR. KACHELMAN (STATE): Your Honor, I think they lose more faith in the court system whenever decisions are not made that are according to the law. Then we have to appeal them up, and then they come back....
“THE COURT: But wait a minute. Wait a minute. I haven’t ruled on that issue on whether it’s legal or illegal.
“MR. KACHELMAN: I understand that.
“THE COURT: I haven’t gotten that far, because I can’t get past the fact that you guys have all these places open, and you’re sitting there blaming it on the local people.

“And it’s obvious that the local folks are not going to do it, and you know they’re not going to do it. You know as well as I do they’re not going to do it, so it comes to you.

“And, then, if you’re going to do it to one, you’re going to have to do it to all. That’s all I’m saying. And if you’re not going to do it to all, then just leave it, just forget about all of them. You can’t pick and choose. That’s my problem.”
(Emphasis added.)
In its order issued after the hearing the court relied on the recently submitted affidavits as evidence that 1,232 electronic-gambling machines similar to the machines at issue here were operating in Greene County and that 566 such machines were operating in Lowndes County.

2. Quality of the Evidence

In the posttrial hearing the State asked the trial court “to throw out speculation and charts that are not founded oh evidence and rule on the evidence in the case.” The court responded by asking KCED’s counsel to substantiate the figures on the time chart.
“THE COURT: Mr. Espy, where did you get those days in the chart?
“MR. JOE ESPY: We had people who were familiar personally with them to go do them.”
The State also argued in its appeal brief that the “days open” chart was inadmissible. “KCED offered demonstrative charts of law enforcement activity, but those charts have no foundation in testimonial evidence.” State’s brief, at 20. The evi-dentiary competence of the “days open” chart, objected to below and raised on appeal, is thus properly before us.
“The arguments of counsel are not evidence.” Deng v. Scroggins, 169 So.3d 1015, 1028 (Ala.2014). See also Turner v. W. Ridge Apartments, Inc., 893 So.2d 332, 335 (Ala.2004) (same); American Nat’l Bank & Trust Co. of Mobile v. Long, 281 Ala. 654, 656, 207 So.2d 129, 132 (1968) (“The unsworn statement of counsel [is] not evidence.... ”); and Ex parte Russell, 911 So.2d 719, 725 (Ala.Civ.App.2005) (“The unsworn statements, factual assertions, and arguments of counsel are not evidence.”). The trial court’s use of the data in the “days open” chart and its “discussion with counsel for all the parties” as the factual basis for the equal-protection ruling in its first order was improper. Lacking • a foundation in admissible evidence, the trial court’s equal-protection ruling cannot survive review.
In the posttrial hearing, however, the court had available the two affidavits *826 of recent visitors to local casinos. Although the State objected to the affidavits as untimely, a court has discretion to admit new evidence in a postjudgment hearing. Ex parte Johnson, 673 So.2d 410, 412 (Ala.1994). The State did not .object on confrontation grounds, Thus, the trial court could properly consider the affidavit evidence, which it restated in its second order, indicating that other casinos in the State were currently operating machines similar to those that had been seized at VictoryLand. Additionally, Dr. Benefield testified during the trial that he had made a visit to certain casinos at that same time and had played machines similar to the VictoryLand machines.
Although the State disputed the trial court’s assertion that it had ignored other operators of casinos and had targeted only VictoryLand, the State’s statements, like the trial court’s colloquy'with KCED’s counsel, were not admissible evidence. This Court, however, may take notice of our own prior decisions.
The efforts of the State to enforce Alabama’s gambling laws and to prevent misuse of local constitutional amendments legalizing bingo have resulted in at least a dozen decisions by this Court during the last six years.[5] We began our analysis in one of those cases, State v. Greenetrack, Inc., 154 So.3d 940 (Ala.2014), by noting the widespread efforts undertaken by State law-enforcement officials and by county and State courts to shut down so-called “electronic-bingo machines” in locale after locale throughout Alabama:
“[T]he State takes note of our holding in [Barber v.] Cornerstone [Community Outreach, Inc., 42 So.3d 65 (Ala.2009),] and our reliance upon. Cornerstone last year in Ex parte State, 121 So.3d 337, 359 (Ala.2013). The State also notes that, consistent with these holdings, judges have in recent months issued warrants to the State to seize so-called ‘electronic bingo machines’ in Greene, Houston, Jefferson, and Lowndes Counties and judges in Jefferson and Houston Counties have issued various final rulings finding this sort of gambling illegal.”
154 So.3d at 948. Indeed, Greenetrack itself and other cases evidence continuing activity on the part of the State since the February 19, 2013, raid at VictoryLand to enforce Alabama’s gambling laws against other casinos operating in the State. See, e.g., Houston Cty. Econ. Dev. Auth. v. State, 168 So.3d 4 (Ala.2014) (Houston County); Alabama v. PCI Gaming Auth., 801 F.3d 1278 (11th Cir.2015) (relating to a challenge by the State to the operation of tribal casinos in Alabama). Thus, solely on factual grounds, the trial court’s selective-prosecution finding conflicts with cases previously before this Court. Beyond the problems with the factual grounds for the trial court’s finding, however, the trial court’s legal standard for finding an equal-protection violation is not one the law recognizes.

S. Legal Standard

Prosecutors have broad discretion to choose which cases they will prosecute. “[S]o long as the prosecutor has *827 probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute ... generally rests entirely in his discretion.” Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978).[6] A “presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.” United States v. Chemical Found., Inc., 272 U.S. 1, 14-15, 47 S.Ct. 1, 71 L.Ed. 131 (1926). Prosecutorial discretion will not be subject to strict equal-protection scrutiny unless a fundamental right is implicated or a suspect class targeted. City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Gambling is not a fundamental right. “There is no constitutional right to gamble.” Lewis v. United States, 348 U.S. 419, 423, 75 S.Ct. 415, 99 L.Ed. 475 (1955), overruled on other grounds, Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968). KCED did not argue, and the trial court did not find, that Victo-ryLand has been targeted for prosecution on the basis that it is part of a suspect class, e.g., race, religion, or nationality. “The burden is ... on [KCED] to prove the existence of purposeful discrimination.” Whitus v. Georgia, 385 U.S. 545, 550, 87 5.Ct. 643, 17 L.Ed.2d 599 (1967). But first KCED must allege purposeful discrimination, which it has not. Indeed, KCED eschewed the equal-protection argument until the trial court spontaneously inserted it into the case.
To reiterate, “the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation” unless “the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.” Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). To demonstrate discriminatory enforcement of a statute, “three elements must generally be proved: selectivity in enforcement; selectivity that is intentional; and selectivity based upon some invidious or unjustifiable standard such as race, religion, or other arbitrary classification.” DeShazo v. City of Huntsville, 416 So.2d 1100, 1103 (Ala.Crim.App.1982). See also Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944) (requiring “an element of intentional or purposeful discrimination” to state an equal-protection claim based on selective prosecution). A selective-prosecution claim, therefore, must not merely allege disparity in enforcement but also intentional discrimination against a suspect, class. “It is insufficient merely to show that other violators have not been prosecuted, that there has been laxity in enforcement, or that there has been conscious exercise of some selectivity in enforcement.” DeShazo, 416 So.2d at 1103. Instead, “[discriminatory enforcement violative of the Fourteenth Amendment requires a showing of intentional and purposeful selection based on an unjustifiable standard.” Butler v. State, 344 So.2d. 203, 207 (Ala.Crim.App.1977). As long as “intentional selectivity based upon an unjustifiable standard” is not present, enforcement of a statute, contrary to the trial court’s analysis, need not be universal to satisfy the Equal Protection Clause. ' Starley v. City of Birmingham, 377 So.2d 1131, 1133 (Ala.Crim.App.1979).[7]
*828 Thus, selectivity in enforcement, within boundaries that have not been breached or even alleged to have been breached in this case, does not violate the Equal Protection Clause of the Fourteenth Amendment.

k. Separation of Powers

A further difficulty with the trial court’s selective-prosecution argument, as exemplified by its interrogation of the State at trial and during the posttrial hearing, was its intrusion into the discretionary functions of the executive branch, a violation of the separation-of-powers doctrine that implicates the subject-matter jurisdiction of the court. “ ‘A prosecutor is not subject to judicial supervision in determining what charges to bring and how to draft accusatory pleadings; he is protected from judicial oversight by the doctrine of separation of powers.’ ” Piggly Wiggly No. 208, Inc. v. Dutton, 601 So.2d 907, 910 (Ala. 1992) (quoting 63A Am.Jur.2d Prosecuting Attorneys § 24 (1984)). See also Tyson v. Jones, 60 So.3d 831, 842 (Ala.2010) (noting that “a court generally has no jurisdiction to enjoin law enforcement in the performance of its investigatory and prosecutorial functions”). The United States Supreme Court has explained why close judicial oversight of prosecutorial decision-making is inappropriate:
“[T]he decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution’s general deterrence value, the Government’s enforcement priorities, and the case’s relationship to the Government’s overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.”
Wayte v. United States, 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). Alluding to separation-of-powers concerns, the Supreme Court has stated that judicial oversight may “unnecessarily impair the performance of a core executive constitutional function.” United States v. Armstrong, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). Close judicial scrutiny of prosecutorial decisions may imperil investigations and reveal law-enforcement priorities to potential targets. “Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor’s motives and decision-making to outside inquiry, and may undermine prose-cutorial effectiveness by revealing the Government’s enforcement policy.” Wayte, 470 U.S. at 607.
That is exactly what occurred in this case. Although the trial court repeatedly interrogated the State about its plans to investigate and to prosecute other casino operators, the State properly refused to divulge such information. ‘Your Honor,” replied counsel for the State, “you’re not privy to what investigations or cases are going — are ongoing. That’s part of being a prosecutor, Judge. You’re not privy to those things. And for you to suppose or make a ruling on what you think or don’t think is happening is just improper.” *829 When the trial court continued to press the question, counsel for the State again responded: “I’m not going to tell the Court my privy — private investigations that may have or have not occurred.” The court did not relent: “I’m asking you, .are you going to just leave them open is what I want to know.” Counsel for the State responded: “I’m not telling you in court what our plans are, Your Honor. This case is what is before the Court. That’s what I’m asking you to rule on.”
These exchanges illustrate the impropriety of close scrutiny by the judiciary of the exercise of prosecutorial discretion. To protect “the performance of a core executive constitutional function,” Armstrong, 517 U.S. at 465, counsel for the State properly refused to disclose ongoing investigations or planned actions against other gambling facilities. The trial court’s close examination of prosecutorial decision-making created the danger of “under-min[ing] prosecutorial effectiveness by revealing the Government’s enforcement policy.” Wayte, 470 U.S. at 607. By refusing to answer the trial court’s questions, the State prevented the trial court from running afoul of the separation-of-powers doctrine. See Piggly Wiggly, 601 So.2d at 910; art. VI, § 43, Ala. Const. 1901 (stating that “the judicial [department] shall never exercise the ... executive powers”). As the State repeatedly pointed out at trial, the trial court was attempting to control the. constitutional discretion of the executive branch.

5. Cases on Selective Prosecution of Bingo Operations

Two courts have addressed the issue of selective prosecution of operators of bingo facilities. In United States v. Cyprian, 23 F.3d 1189 (7th Cir.1994), a large bingo game was operating in the Gary, Indiana, area, known as “the McBride Game.” Although the game was organized under the rubric of a church, the profits from the game were pocketed by the managers of the enterprise. The defendants complained that the McBride Game had been selectively and unfairly targeted for prosecution. The Seventh Circuit disagreed:
“[E]ven though the government appears to concede that other bingo games in the area were not prosecuted, the McBride Game was' not only illegal, and subject to prosecution on that ground alone, but was also apparently the largest bingo game of its kind. Certainly the government may concentrate its efforts on those violations which ‘appear most flagrant.’ ”
23 F.3d at 1196 (quoting United States v. Heilman, 614 F.2d 1133, 1139 (7th Cir. 1980)).
In Fraternal Order of Eagles Sheridan Aerie No. 186, Inc. v. State, 126 P.3d 847, 865 (Wyo.2006), operators of a “bingo” game in Sheridan, Wyoming, claimed that they were “victims of arbitrary and discriminatory enforcement” of the gambling statutes of that state. They argued that state prosecutors had not attempted to shut down a similar game fun by a television station. Applying an equal-protection analysis to this selective-prosecution claim, the Supreme Court of Wyoming noted the necessity of showing an “impermissible motive,” namely that “ ‘the charge was deliberately based on an unjustifiable standard or designed to inhibit the exercise of a constitutional right by the accused.’ ” 126 P.3d at 866 (quoting Misenheimer v. State, 27 P.3d 273, 281 (Wyo.2001)). Finding that the record was “totally devoid” of evidence of the prosecution’s motivation, the court stated that it was “unwilling to presume impermissible motives.” Fraternal Order, 126 P.3d at 866. Furthermore, “that the appellants got away with violating the statutes for quite some time does *830 not equate to arbitrary and discriminatory prosecution in their present situation.” Id,

6. Summary

The trial court’s equal-protection holding served as the exclusive rationale for its first order dismissing the case and was substantially repeated in'its second order directing the conditional return of the seized machines.. That holding, however, is fatally flawed. In its first order the trial court relied primarily on a chart and discussion with counsel, neither of which was admissible evidence. Although the second order relied on affidavits of persons who had visited other facilities, the holding that the State ignored other gambling operar tions while targeting VictoryLand for prosecution is belied by this Court’s own published cases.
In addition, regardless of the strength or weakness of the factual underpinnings of its equal-protection holding, the trial court misunderstood the law of selective prosecution, overlooking the necessity of a finding of intentional and invidious discrimination. See Starley, 377 So.2d at 1132-33. Also, by closely interrogating the State about its plans to prosecute, the trial court intruded into the realm of pros-ecutorial discretion, violating the doctrine of separation of powers.
Having determined that the trial court’s equal-protection holding was in error, we now turn to the alternative rationale in its second order — that the legislators who passed the act proposing Amendment No. 744 and the voters of Macon County who ratified it intended to authorize the type of electronic machines played at Victory-Land.

B. Legislative and Voter Intent

After KCED complained that the trial court had completely failed in its first order to address its.“intent” defense, which was the heart of KCED’s case, the trial court included the following paragraph in its second order:
“KCED presented testimony of Myron Penn, Johnny Ford, Louis Maxwell, Mary Hicks and Theodore Samuel. Their testimony was that Amendment [No.] 744 was proposed to allow all forms of bingo in Macon County so that they could compete economically with other counties that allowed other forms of bingo, including electronic bingo. Sixteen exhibits offered by KCED, consisting of election flyers, advertisements, proclamations, and newspaper articles, either advocating for or against Amendment [No.] 744, were also admitted. These exhibits provided substantial evidence that the voters in Macon County understood bingo to mean all forms of bingo, including electronic. The State of Alabama did not produce any evidence in opposition. Based upon the evidence presented by KCED and the lack of any evidence from the State, the Court concludes that the Macon County voter when voting on the amendment understood it to be all forms of bingo.”

1. Legislative Intent

The trial court found that “Amendment [No.] 744 was proposed to allow all forms of bingo in Macon County so that [it] could compete economically with other counties that allowed other forms of bingo, including electronic bingo.” (Emphasis added.) The trial court purported to discern and to rely upon the intent of the legislature in passing House Bill 660 (“HB 660”), which, when ratified by the voters of Macon County, became Amendment No. 744. That supposed intent is not apparent on the face of Amendment No. 744, which does not include the terms “electronic bingo,” “all forms of bingo,” or any equivalent language. In 2004, *831 when Amendment No. 744 was ratified, Johnny Ford and Myron Penn were, respectively, a state representative and a state senator for districts that included Macon County. Representative Ford testified extensively about information provided to voters during the period before the ratification vote. He said nothing, however, about the intent of the legislators who passed HB 660. Neither did Senator Penn testify as to the intent of his fellow legislators in passing HB 660 in the Senate. He stated only that he personally urged the passage of HB 660 to “provide bingo in all forms, including electronic bingo.” He also stated that the debate in the House and the Senate about HB 660 “was about, mainly, electronic bingo.”
The State objected to testimony about legislative intent on the basis of James v. Todd, 267 Ala. 495, 103 So.2d 19 (1957). As the Court explained in James: “ ‘The intention of the Legislature, to which effect must be given, is that expressed in the statute, and the courts will not inquire into the motives which influenced the Legislature or individual members in voting for its passage....’” Id. at 28 (quoting Wiseman v. Madison Cadillac Co., 191 Ark. 1021, 88 S.W.2d 1007, 1009 (1935) (emphasis added)). The James Court upheld the trial court’s ruling that testimony regarding the motives of individuals voting for the passage of legislation was incompetent. Id.
Because the testimony of a trial witness as to what legislators intended in voting for a statute (or a proposed constitutional amendment) is inadmissible as evidence, the trial court in the present case should have upheld the State’s objection to the testimony of Ford and Pehn. In fact, KCED recognized at trial that James controlled the issue of legislative intent and attempted to explain that the testimony was meant only to express the personal views of Ford and Penn. Counsel for KCED stated: “None of them tried to express the intention of .., the Legisla-ture_” Even understood in this manner, however, any testimony of Ford and Penn as to what the legislature intended is of no probative value. “The motives or reasons of an individual legislator are not relevant to the intent of the full legislature in passing the bill.”. Eagerton v. Terra Res., Inc., 426 So.2d 807, 809 (Ala.1982).
Finally, a finding of legislative intent, even if permissible or possible, would be meaningless because no evidence was offered indicating that the voters who ratified Amendment No. 744 were aware of the legislators’ intent. “The opinion of drafters or of legislators who sponsor an initiative is not relevant since such opinion does not represent the intent of the electorate and we cannot say with assurance that the voters were aware of the drafters’ intent.” Taxpayers to Limit Campaign Spending v. Fair Political Practices Comm’n, 51 Cal.3d 744, 764 n. 10, 274 Cal.Rptr. 787, 800 n. 10, 799 P.2d 1220, 1233 n. 10 (1990).

2. Voter Intent

The trial court found that election material and related newspaper articles “provided substantial' evidence that the voters in Macon County understood bingo to mean all forms of bingo, including electronic.” On that basis, it concluded that “the Macon County voter when voting on the amendment understood it to be all forms of bingo.” KCED’s argument at trial and on appeal is that the voter intent discerned by the trial‘court should control the construction of Amendment' No. 744. Any other conclusion, it argues, “would be merely a type of judicial activism, imposing the judicial will over the will of the People.” KCED’s brief, at 53.
*832 • Use of election materials such as flyers and advertisements to discern the intent of the electorate in voting on a constitutional amendment provides an obvious opportunity for manipulation of the judicial process. Once proponents of an amendment know that courts will rely on. such materials in order to discern the electorate’s intent, an incentive exists to produce and distribute materials that favor the desired interpretation. Skepticism about the use of legislative history, arising from its potential for manipulation, has been expressed by a number of judges and provides a useful perspective on the questionable validity of using “ratification history” to construe a constitutional amendment. Courts that rely on legislative history, e.g., floor debates and committee reports, to discern the meaning of statutes have seen this crafty process at work.[8] Knowing that some judges may be willing to use such materials to discern legislative intent, the unscrupulous deliberately manufacture statements for insertion into committee reports and recorded debates in order to sway a reviewing court to their view of the meaning of a statute. Meanwhile, the legislative body that actually passed the law may be completely unaware of the existence of these carefully designed additions to the legislative record.
A federal appellate judge observes: “[T]o the degree that judges are perceived as grasping at any fragment of legislative history for insights into congressional intent, to that degree will legislators be encouraged to salt the legislative record with unilateral interpretations of statutory provisions they were unable to persuade their colleagues to accept....” International Bhd. of Elec. Workers, Local Union No. 474, AFL-CIO v. NLRB, 814 F.2d 697, 717 (D.C.Cir.1987) (Buckley, J., concurring). Another judge makes the same point: “The propensity of judges to look past the statutory language is well known to legislators. It creates strong incentives for manipulating legislative history to achieve through the courts results not achievable during the enactment process. The potential for abuse is great.” Wallace v. Christensen, 802 F.2d 1539, 1559 (9th Cir.1986) (Kozinski, J., concurring in the judgment). See also Federal Election Comm’n v. Rose, 806 F.2d 1081, 1090 (D.C.Cir.1986) (noting “the well-recognized phenomenon of deliberate manipulation of legislative history at the committee level to achieve what likely cannot be won before Congress as a whole”); Kenneth W. Starr, Observations about the Use of Legislative History, 1987 Duke L.J. 371, 377 (“It is well known that technocrats, lobbyists and attorneys have created a virtual cottage industry in fashioning legislative history so that the Congress will appear to embrace their particular view in a given statute.”).
If the use of committee reports and floor statements is suspect in understanding legislative intent, election flyers and newspaper editorials are that much less helpful in discerning the collective will of thousands of voters. One commentator observes:
“Even if we granted that individual voter intent existed ... courts simply could not cumulate what may be millions [in this case thousands] of voter intentions.”
“Asking judges to wade into the domain of media coverage and advertising in search of a singular and dispositive popular intent ... imagines a judicial task that is onerous and — more significantly — ultimately incoherent.”
*833 Jane S. Schacter, The Pursuit of “Popular Intent”: Interpretive Dilemmas in Direct Democracy, 105 Yale L.J. 107, 124-25, 144 (1995).
As the Nebraska Supreme Court observed in construing the language of a constitutional amendment: “There is no meaningful way ... to determine the intent of those voters who vote for the adoption of an enactment. The motivations and mental processes of the voter ... cannot be determined — except from the words of the enactment itself.” Omaha Nat’l Bank v. Spire, 223 Neb. 209, 224-25, 389 N.W.2d 269, 279 (1986). The Spire court, although granting the possibility of discerning the intent of legislators in adopting a statute or the intent of the proponents of a constitutional amendment, completely rejected the possibility of conducting the same exercise on an entire electorate:
“The intent with which a statute is adopted by a small number of legislators, or even the intent with which a larger group in a constitutional convention adopts a Constitution, or a part thereof, may be divined from examination of the proceedings of such groups, but it is impossible to divine the intent of myriad voters who adopt a constitutional amendment.”
223 Neb. at 225, 389 N.W.2d at 279. See also U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 921, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (Thomas, J., dissenting) (noting that “inquiries into legislative intent are even more difficult than usual when the legislative body whose unified intent must be determined consists of 825,-162 Arkansas voters”); Lemon v. United States, 564 A.2d 1368, 1381 (D.C.1989) (“The difficulties inherent in discerning the collective intent of a legislative body in enacting a law ... are éven more pronounced where the decision was made directly by the electorate.”).
The use of such election materials is even more suspect in the context of Alabama’s local-amendment process. A constitutional amendment whose effect is limited to one county — a local amendment— must be approved statewide if even one legislator dissents from the act proposing the amendment.
“(a) Any proposed constitutional amendment which affects or applies to only one county shall be adopted as a valid part of the constitution by a favorable vote of a majority of the qualified electors of the affected county who vote on the amendment....
“(b) The proposed amendment shall first be approved by at least a three-fifths vote of the elected members of each house of the Legislature with no dissenting vote cast ....
[[Image here]]
“(d) In the event any constitutional amendment proposed for adoption pursuant to this amendment is approved by at least a three-fifths vote of the elected members of each house of the Legislature but tvith one or more dissenting votes cast, the amendment shall be treated as a statewide amendment .... ”
Art. XVIII, § 284.01, Ala. Const. 1901 (Off.Recomp.) (emphasis added).
Because a single dissenting vote in either house of the legislature mandates a statewide vote on a proposed local amendment, proponents of such amendments have an incentive to draft them to be as uncontroversial as possible. In keeping with this necessity, HB 660 modeled itself on all the other extant bingo amendments in the State that were understood to permit only what KCED terms “old-fashioned bingo.” KCED’s brief, at 15.
Finally, we note that Judge Shashy, while admitting testimony and exhibits concerning information provided to the *834 voters, sustained objections to testimony as to what the voters were actually thinking when they marked their ballots.
“[REP. FORD]: And the-people voted— overwhelmingly, over 76 percent voted yes on bingo. And they understood that it would be played in all forms.
“MR. REAGAN: Objection, Your Hon- or, to what the citizens understood when they voted on the bill.
“THE COURT: All right. Sustained.”
Further questioning of Representative Ford had the same result.
“[COUNSEL FOR KCED:] Did electronic bingo accomplish in Macon County what you understood the voters in Macon County sought when you introduced HB 660? '
“MR. REAGAN: Objection, Your Hon- or, what the witness thought other voters—
“THE COURT: Sustained.”
Thus, the trial court’s finding “that the Macon County voter when voting on the amendment understood it to be all forms of bingo” is belied by the court’s own rulings excluding testimony to that effect.

3. Summary

When construing a statute or a constitutional amendment, this Court does not consider trial testimony about legislative intent, James, and such testimony, even if admissible, would not be helpful in this case because the relevant intent would be that of the voters who ratified Amendment' No. 744. In turn, apart from the intent to adopt the express language of an amendment, voter intent is an indiscernible commodity and certainly may not be employed to read something into an enactment that does not appear in the language of the enactment. Use of “voter intent” to construe a constitutional amendment would open the judicial process to the kind of manipulation that has been identified with the “cottage industry” devoted to manufacturing evidence of legislative “intent.” That temptation is magnified in the context of § 284.01, Ala. Const.1901, which requires a statewide vote on a local amendment if even one legislator casts a dissenting vote. In any case, Judge Shashy, although making a finding concerning voter intent, at trial sustained objections to testimony regarding voter intent.
Having disposed of the trial court’s equal-protection and voter-intent rationales for dismissing the State’s forfeiture petition, we now turn to the contention raised by, the State at trial and on appeal — but ' not addressed by the trial court — that the electronic machines seized at VictoryLand were illegal gambling devices.

C. The Meaning of “Bingo" in Amend- ' ment No. 7¼

Section 65 of the Alabama Constitution of 1901 prohibits “lotteries,” “gift enterprises,” and “any scheme in the nature of a. lottery.” The elements of a lottery that violate § 65 of the Constitution of Alabama are “(1) a prize, (2) awarded by chance, and (3) for a consideration.” Pepsi Cola Bottling Co. of Luverne, Inc. v. Coca-Cola Bottling Co., Andalusia, 534 So.2d 295, 296 (Ala.1988). It is this so-called “anti-lottery provision” that stands as the constitutional bar not just to what is known in contemporary parlance as a “lottery,” but to slot machines and all other forms of gambling in Alabama. In 1981, the Justices of this Court, quoting Yellow-Stone Kit v. State, 88 Ala. 196, 7 So. 338 (1889), explained that “‘[t]he courts have shown a general disposition to bring within the term ‘lottery* every species of gaming, involving a disposition of prizes by lot or *835 chance....”’ Opinion of the Justices No. 277, 397 So.2d 546, 547 (Ala.1981).[9]
The efforts to circumvent § 65 have taken on a seemingly endless variety of imaginative forms over a long period. For over 100 years, the appellate courts of this State have addressed cases involving efforts by gambling interests to evade this prohibition in an endless variety of new and inventive ways. See, e.g., Grimes v. State, 235 Ala. 192, 193, 178 So. 73, 73 (1937) (noting that the language of § 65 was adopted from the Alabama Constitution, of 1875 and that “[t]he lust, for profit by catering to and commercializing- the gambling spirit has given rise to many ingenious devices”). As this Court explained in 2006 in responding to yet another of those attempts:
“The owners [of the gambling establishment] propose that they have found, and exploited, a ‘loophole’ in the law.... Alabama’s gambling law, however, is not so easily evaded. It is ‘ “the policy of the constitution and laws of Alabama [to prohibit] the vicious system of lottery schemes and the evil practice of gaming, in all their protean shapes.” ’ ”
Barber v. Jefferson Cty. Racing Ass’n, Inc., 960 So.2d 599, 614 (Ala.2006) (quoting Opinion of the Justices No. 83, 249 Ala. 516, 517, 31 So.2d 753, 754 (1947), quoting in turn Johnson v. State, 83 Ala. 66, 67, 3 So. 790, 791 (1887) (emphasis added in Barber)).
The latest “protean shape” conceived by those who would own or operate casinos in Alabama has been electronic machines claimed to constitute the game of “bingo” within the meaning of various local constitutional amendments that allow bingo in certain counties for charitable or similar purposes. Before directly examining this recent conception, it is helpful to consider our courts’ response to earlier “protean shapes” conceived in an effort to circumvent § 65.
One of the earliest rejections by our courts of attempts to misuse local bingo amendments occurred a little over 20 yedrs ago. In City of Piedmont v. Evans, 642 So.2d 435 (Ala.1994), this Court held that “instant bingo” was a form of lottery prohibited by § 65. The Court narrowly construed the term “bingo” as found in Amendment No. 508, Ala. Const.1901 (now Local Amendments, Calhoun County, § 1, *836 Ala. Const. 1901 (Off.Recomp.)), while citing with approval the definition of that term employed by a related municipal ordinance:
“ ‘ “That specific kind of game, or enterprise, commonly known as ‘Hugo,’ in which prizes are awarded on the basis of designated numbers, or symbols, which are drawn, at random, by the operator of said game and which are placed by the persons playing, or participating in said game, on .cards, or sheets of paper, which contain, or set out, numbered spaces, upon which said designated numbers or symbols, may be placed by the persons playing or participating in said game.” ’ ”
City of Piedmont, 642 So.2d at 437 (emphasis added).
Three years later, in Foster v. State, 705 So.2d 534 (Ala.Crim.App.1997), a unanimous Court of Criminal Appeals held in an opinion authored by then Judge Cobb that, where “bingo” is authorized but not otherwise defined by local constitutional amendment, that term means nothing ‘“other than the ordinary game of bingo.’” 705 So.2d at 538 (quoting Barrett v. State, 705 So.2d 529, 532 (Ala.Crim.App.1996)). The Foster court upheld the appellant’s conviction and 12-month prison sentence for promoting gambling and possession of a gambling device where the appellant had contended that the gambling activity he operated was “bingo” within the meaning of the local bingo amendment and of a city ordinance adopted. pursuant to that amendment. The court acknowledged “ ‘this state’s strong public policy against lotteries as expressed in § 65 of the Alabama Constitution,’ ” declared that bingo is a “narrow exception to the prohibition of lotteries in the Alabama Constitution,” and, accordingly, held that “no expression in [an] ordinance [governing the operation of bingo] can be construed to include anything other than the ordinary game of bingo,” lest the ordinance be “inconsistent with the Constitution of Alabama.” 705 So.2d at 537-38 (emphasis added); see also Barrett v. State, 705 So.2d 529 (Ala.Crim.App.1996) (to similar effect).
In more recent years, the strategy of misusing local bingo amendments has been renewed with additional vigor and creativity. Indeed, as noted in Part III.A., above, in just the past six years, the appellate coui-ts of this State have rendered at least a dozen decisions engendered by the advent of so-called “electronic bingo.”[10] No less than six of those cases addressed the meaning of the simple term “bingo” found in those amendments,[11] including Amendment-No. 744, which we addx-essed in one of those cases.[12] The local bingo amendments at issue in those cases were proposed and adopted following, and thus with an actual or imputed knowledge of, the holdings in Evans, Foster, and Barrett. See, e.g., Ex parte Fontaine Trailer Co., 854 So.2d 71, 83 (Ala.2003) (“It is an ingrained principle of statutory construction *837 that ‘[t]he Legislature is presumed to be aware of existing law and judicial interpretation when it adopts [an act]. Ex parte Louisville & N.R.R., 398 So.2d 291, 296 (Ala.1981).’” (quoting Carson v. City of Prichard, 709 So.2d 1199, 1206 (Ala.1998))).[13] Consistent with the holdings in those earlier cases, we repeatedly have made clear in our more recent eases that references to “bingo” in local bingo amendments are references to the ordinary game of bingo, and not to the electronic machines at issue in those cases.
The first in the most recent line of cases addressing the meaning of the term “bingo” was Barber v. Cornerstone Community Outreach, Inc., 42 So.3d 65 (Ala.2009). In Cornerstone, this Court addressed the meaning of the term “bingo” in the context of Amendment No. 674, Ala. Const. 1901 (Local Amendments, Lowndes County, § 3, Ala. Const. 1901 (Off. Recomp.)), applicable to the Town of White Hall in Lowndes County. The operative language of that amendment states simply that “[t]he operation of bingo games for prizes or money by nonprofit organizations for charitable, educational or other lawful purposes shall be legal in The Town of White Hall that is located in Lowndes County. ...” (Emphasis added.) In addition to our reliance upon Evans and Barrett, cited above, we noted in Cornerstone that the operative language of Amendment No. 674, including the unadorned reference to “bingo,” was the same as in other local amendments that had been adopted. See Cornerstone, 42 So.3d at 78-80 (comparing in particular the language of Amendment No. 674 to that of Amendment No. 508 (Local Amendments, Calhoun County, § 1, Ala. Const. 1901 (Off. Recomp.)), which was at issue in Evans and which states that “[t]he operation of bingo games for prizes or money by certain nonprofit organizations for charitable, educational, dr other lawful purposes shall be legal in Calhoun county” (emphasis added)). The language at issue in the present case, in Amendment No. 744 applicable to Macon County, is identical to the language found in the White Hall and Calhoun County amendments (as it-is to the other local bingo amendments governing various localities; see Appendix to this opinion): “The operation of bingo games for prizes or money by nonprofit organizations for charitable, educational, or other lawful purposes shall be legal in Macon County.” (Emphasis added.)
In fact, we noted in Cornerstone that the only local bingo amendment we could find in Alabama that had any noteworthy variation in terminology was the amendment applicable to Greene County, Amendment No. 743 (Local Amendments, - Greene County, § 1, Ala. Const. 1901 (Off. Re-comp.)), which specifically allows “electronic .marking machines.” Even this language, .we explained, does nothing more than allow a player to physically mark an electronic screen rather than a paper card. We specifically noted that this variance in language did not change the other essential characteristics of the game described in Cornerstone, 42 So.3d at 79-80. See also discussion of State v. Greenetrack, Inc., 154 So.3d 940 (Ala.2014), infra.
*838 Having thus noted the similarity in wording of the various local bingo amendments, this Court in Cornerstone went on to emphasize two rules of construction applicable to that wording. We first observed that,
“ ‘[s]ince 1980, Alabama has adopted various constitutional amendments creating exceptions to § 65, specifically allowing the game of bingo under certain circumstances. See Ala. Const. [1901], Amendments 386, 387, 413, 440, 506, 508, 542, 549, 550, 565, 569, 599, and 612.’ (Emphasis added.) . Thus, the bingo amendments are exceptions to the lottery prohibition, and the exception should be narrowly construed.”
Cornerstone, 42 So.3d at 78 (quoting Opinion of the Justices No. 373, 795 So.2d 630, 634 (Ala.2001) (second emphasis added)). In addition, we recognized in Cornerstone that,
“except where the language of a constitutional provision requires otherwise, we look to the plain and commonly understood meaning of the terms used in [the constitutional] provision to discern its meaning.”
42 So.3d at 79 (emphasis added). (Furthermore, we noted that, “‘[although a legislative act cannot change the meaning of a constitutional provision, such act may throw light on its construction.’ ” Id. at 79 (quoting Jansen v. State ex rel. Downing, 273 Ala. 166, 169, 137 So.2d 47, 49 (1962)).)
Based on these principles, as well as an examination of the cases cited above and persuasive authority from other jurisdictions, we held in Cornerstone that the term “bingo” “was intended to reference the game commonly or traditionally known as bingo.” 42 So.3d at 86. Furthermore, we identified six elements that characterize that game, the list being nonexhaustive:
“Based on the foregoing, we must conclude that the term ‘bingo’ as used in Amendment No. 674 was intended to reference the game commonly or traditionally known as bingo. The characteristics of that game include the following:
■ “1. Each player uses one or more cards with spaces1 arranged in five columns and five rows, with an alphanumeric or similar designation assigned to each space.
“2. Alphanumeric or similar designations are randomly drawn and announced one by one.
“3. In order to play, each player must pay attention to the values announced; if one of the values matches a value on one or more of the player’s cards, the player must physically act by marking his or her card accordingly-
“4. A player can fail to pay proper attention or to properly mark his or her card, and thereby miss an opportunity to be declared a winner.
“5. A player must recognize that his or her card has a ‘bingo,’ i.e., a predetermined pattern of matching values, and in turn announce to the other players and the announcer that this is the case before any other player does so.
“6. The game of bingo contemplates a group activity in which multiple players compete against each other to be the first to properly mark a card with the predetermined winning pattern and announce that fact.”
42 So.3d at 86.
Several months after the release of our opinion in Cornerstone, we decided Riley v. Cornerstone Community Outreach, Inc., 57 So.3d 704 (Ala.2010), in which we explained that we had recognized in Cornerstone “that the game of bingo authorized by the local amendment was that game commonly and traditionally known as bin *839 go, and we [had] provided a non-exhaustive list of characteristics of that game.” Riley, 57 So.3d at 710. We also noted that “the game traditionally known as bingo” is a game that
“is not played by or within the electronic or computerized circuitry of a machine, but one that is played on physical cards (typically made of cardboard or paper) and that requires meaningful interaction between those who are playing and someone responsible for calling out the randomly drawn designations corresponding to designations on the players’ cards.” , .
57 So.3d at-734.
On March 1, 2013, this Court again affirmed that the Cornerstone test was applicable to the term “bingo” as used in Alabama’s various local bingo amendments, including specifically the Macon County amendment at issue in the case now before us. See Ex parte State, 121 So.3d 337 (Ala.2013). This Court left no doubt that the language of Amendment No. 744 authorizes only the game “traditionally known as bingo,” and we again affirmed the Cornerstone test. We explained that the Cornerstone test “refers to the game commonly and traditionally known as ‘bingo,’” which includes the six elements of that traditional game as described in Cornerstone, and that the test was “more than clear enough to serve as guide in measuring the facts of th[at] case” against the language of Amendment No. 744. Ex parte State, 121 So.3d at 356.
On April 1, 2014, this Court decided State v. Greenetrack, Inc., 154 So.3d 940 (Ala.2014), a case in which we yet again affirmed that the references to “bingo” in the local bingo amendments, including, in that case, Amendment No. 743 applicable to Greene County, are references to the “traditional game of bingo” and the nonex-haustive list of six elements of that game as set out in Cornerstone. As already noted, see discussion in Part III.A, supra, we began our analysis by noting the widespread efforts undertaken by State law-enforcement officials and by county and State courts to shut down so-called electronic-bingo machines in locale after locale throughout Alabama.
As to the meaning of the term “bingo” in Amendment No. 743, we held that the denial of a search warrant by a trial court judge had been made based upon “an incorrect legal standard,” namely, an incorrect understanding of what constituted “bingo” for purposes of Amendment No. 743. Greenetrack, Inc., 154 So.3d at 958. We reaffirmed the ubiquitous meaning of the term “bingo” in Alabama’s various local bingo amendments:
“Amendment No. 743, just like the amendment at issue in Cornerstone and bingo amendments applicable to other counties, speaks of and permits the playing of ‘bingo games’ (provided that a number, of other restrictions, including charitable purposes, are met).[14] We identified in Cornerstone and we reaffirm today that the game of ‘bingo’ as that term is used in local constitutional amendments throughout the State is that game ‘commonly or traditionally knoim as bingo,’ So.3d at 86, and that this game is characterized by at least the six elements we identified in Cornerstone. Id.”
*840 Greenetrack, Inc., 154 So.3d at 959 (emphasis added).
As already noted, we further explained in Greenetrack that there was only one noteworthy difference between the language of Amendment No. 743 and the other local bingo amendments throughout the State. In this regard, we noted that Amendment No. 743 allows for the use of “electronic marking machines” rather than “a ‘card’ in the sense of a flat rectangular or square object made of paper, cardboard, or some similar material on which the required designations are printed.” Greenetrack, Inc., 154 So.3d at 959. We emphasized that, in all other respects, the characteristics of bingo as that term is used in other local bingo amendments are applicable under Amendment No. 743 and reiterated and affirmed our discussion of Amendment No. 743 in Cornerstone:
“ ‘Amendment No. 743 ... legalizes in Greene County a form of bingo that would include cm “electronic marking machine” in lieu of a paper card. Even [Amendment No. 743], which is the only amendment in Alabama we have located that makes any reference to the use of electronic equipment of any form, contemplates a game in all material respects similar to the game of bingo described in § 45-8-150(1), [Ala.Code 1975,][15] and something that is materially different from the types of electronic gaming machines at issue here. Amendment No. 743 begins by saying that “bingo” is “[t]hat specific kind of game commonly known as bingo.” The definition then explains that bingo is a game “in which prizes are awarded on the basis of designated numbers or symbols on a card or electronic marking machine conforming to numbers or symbols selected at random.” Moreover, the equipment contemplated by Amendment No. 743 for use in a bingo game is entirely different than the equipment at issue here. Specifically, Amendment No. 743 defines “equipment” for the game of bingo as follows:
“ ‘ “The receptacle and numbered objects drawn from it, the master board upon which such objects are placed as drawn, the cards or sheets bearing numbers or other designations to be covered and the objects used to cover them or electronic card marking machines, and the board or signs, however operated, used to announce or display the numbers or designations as they are drawn.” ’ ”
154 So.3d at 960 (quoting Cornerstone, 42 So.3d at 79-80).
Finally, on November 21, 2014, this Court decided Houston County Economic Development Authority v. State, 168 So.3d 4 (Ala.2014). As we have done yet again in this opinion, we reviewed in Houston County much of the history of this Court’s decisions addressing bingo over the past six years. In so doing, we once again affirmed that the unadorned term “bingo” in Alabama’s local amendments is a refer *841 ence to the game “traditionally known as bingo,” including the six elements for that game discussed in Cornerstone:
“This Court repeatedly has held that ‘bingo’ is a form of lottery prohibited by Ala. Const.1901, Art. IV, § 65. See, e.g., Barber v. Cornerstone Cmty. Outreach, Inc., 42 So.3d 65, 78 (Ala.2009); City of Piedmont v. Evans, 642 So.2d 435, 436 (Ala.1994). We therefore begin our analysis by emphasizing once again that the various constitutional amendments permitting ‘bingo’ are exceptions to the general prohibition of § 65 and that, as such, they must be ‘narrowly construed.’ As we held in Cornerstone:
“‘“Since 1980, Alabama has adopted various constitutional amendments creating exceptions to § 65, specifically allowing the game of bingo under certain circumstances. See Ala. Const. [1901], Amendments 386, 387, 413, 440, 506, 508, 542, 549, 550, 565, 569, 599, and 612,” (Emphasis added.) Thus, the bingo amendments are exceptions to the lottery prohibition, and the exception should be narrowly construed.’
“42 So.3d at 78 (quoting Opinion of. the Justices No. 373, 795 So.2d 630, 634 (Ala.2001)).
“In addition to this fundamental principle of ‘narrow construction,’ we also recognized in Cornerstone the need, ‘except where the language of a constitutional provision requires otherwise,’ to ‘look to the plain and commonly understood meaning of the terms used in [the constitutional]. provision to discern its meaning.’ 42 So.3d at 79. Furthermore, we noted that, ‘ “[ajlthough a legislative act cannot change the meaning of a constitutional provision, such act may throw light on its construction.’ ’’Id. at 79 (quoting Jansen v. State ex rel. Downing, 273 Ala. 166, 169, 137 So.2d 47, 49. (1962)). Based on the above-described rules of construction, together with an examination of persuasive authority .from other jurisdictions, we held in Cornerstone that the term ■ ‘bingo’ ‘was intended to reference the game commonly or traditionally known as bingo.’ 42 So.3d at 86. Furthermore, we identified six elements that characterize the game of bingo, the list being nonexhaustive:
« i f
“We have since stated that our analysis in Cornerstone is applicable to the other local bingo constitutional amendments in this State. State v. Greenetrack, Inc., 154 So.3d 940, 959 (Ala.2014) (‘[T]he game of “bingo” as that term is used in local constitutional amendments throughout the State is that game “commonly or traditionally known as bingo,” 42 So.3d at 86, and ... this game is characterized by at least the six elements we identified in Cornerstone.’).”
168 So.3d at 9-11 (first emphasis original; other emphasis added).
Moreover, it was necessary in Houston County to elaborate upon each of the Cornerstone elements to respond to the construction given each of them by the trial court in that case. Although it is not necessary to reproduce here our elaboration upon each of the six elements, by this reference we reaffirm that analysis. Further, we reiterate our conclusion in Houston County, which summarized much of that analysis:
“[T]he game traditionally known as bingo is not one played by or within an electronic or computerized machine, terminal, or server, but is one played outside of machines and electronic circuitry. It is a group activity, and one that requires a meaningful measure of human interaction and skill. This includes attentiveness and discernment *842 and physical, visual, auditory, and verbal interaction by and between those persons who are playing and between the players and a person commonly known as the ‘announcer’ or ‘caller,’ who is responsible for calling out the randomly drawn designations and allowing time between each call for the players to check their cards and to physically mark them accordingly. In accordance with the previously stated list of characteristics, each player purchases and plays the game on one or more cards that, in a county such as Houston County (in which the amendment does not expressly permit ‘electronic marking machines’), are not electronic devices or electronic depictions of playing surfaces but are actual physical cards made, of cardboard, paper, or some functionally similar material that is flat and is.pre-printed with the grid and the designations [required],”
168 So.3d at 18 (emphasis added).
KCED concedes that the machines at issue here are not the game commonly and traditionally known as bingo and that they do not meet the six elements identified in Cornerstone and further explained in Houston County.[16] Nonetheless, KCED takes the position that the term “bingo” in Amendment No. 744 means something different than that term in Alabama’s other “bingo amendments.” KCED’s position, however, is contrary to all the above-discussed precedents,' as well as the well-settled principles of plain meaning and narrow construction upon which they are based. The language of Amendment No. 744 is clear, and the “plain and commonly understood meaning” of the simple term “bingo,” especially when coupled with the principle of narrow construction, necessarily yields the same meaning as a matter of law for that term in Macon County’s Amendment No. 744 as it does for the same term in Alabama’s numerous other bingo amendments.[17]
As Justice Harwood noted in his special writing in City of Bessemer v. McClain, 957 So.2d 1061, 1082 (Ala.2006) (Harwood, J., concurring in part and dissenting in part): “[Djeference to the ordinary and plain meaning of the language of a statute is not merely a matter of an accommodating judicial philosophy; it is a response to the constitutional mandate of the doctrine of the separation of powers set out in Art. III, § 43, Alabama Constitution of 1901.” This principle, of course, is- equally applicable to constitutional provisions.
This Court is not at liberty to deviate from the plain meaning of the term “bingo” nor from the principle of narrow construction heretofore noted. It simply cannot feasibly be maintained that Alabama’s local bingo amendments permitting charitable “bingo,” by their repeated use of this same unadorned term in amendment after amendment, communicate an array of different meanings. Nor can it be maintained that the meaning of each local amendment was to be decided by the judicial branch based upon what might later be proved in a courtroom regarding who said what to whom following the drafting and proposal of the amendment, or what peculiar meaning some voter or group of voters did or did not assume as to the *843 words employed in the amendment. See Part III.B., supra. See also Schacter, 105 Yale L.J. at 124-25 (“[T]he problem of aggregating multiple individual intentions, substantial as it is in the context of the legislative process, is compounded by the daunting scale of direct lawmaking. Even if we granted that individual voter- intent existed — a dubious premise, I will argue— courts simply could not cumulate what may be millions of voter intentions.”). At best, it would be unseemly, and at worst illogical and impracticable, not to mention contrary to a proper understanding of the role of the judiciary, for this and other courts of this State to undertake to attribute some potentially different meaning to each of the 17 local bingo amendments, despite the fact that each of them uses the same language.
“ ‘The intention of the Legislature, to which effect must be given, is that expressed in the [act], and the courts will not inquire into the motives which influenced the Legislature or individual members in voting for its passage, nor indeed as to the intention of the draftsman or of the Legislature so far as it has not been expressed in the act. So in ascertaining the meaning of a[n act] the court will not be governed or influenced by the views or opinions of any or all of the members of the Legislature, or its legislative committees or any other person.’ ”
James v. Todd, 267 Ala. at 506, 103 So.2d at 28-29 (quoting Wiseman v. Madison Cadillac Co., 191 Ark. 1021, 88 S.W.2d 1007, 1009 (1935)); see also Fraternal Order of Police, Lodge No. 64 v. Personnel Bd. of Jefferson Cty., 103 So.3d 17, 27 (Ala.2012) (“Words used in [an act] must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the [act] is unambiguous, then there is, no room for judicial construction and the clearly expressed intent of the legislature must be given effect.” (internal quotation marks omitted)); Hill v. Galliher, 65 So.3d 362, 370 (Ala.2010) (“ ‘ “If, giving the ... language [of the act] its plain and ordinary meaning, we conclude that the language is unambiguous, there is no room for judicial construction.’”” (quoting Bright v. Calhoun, 988 So.2d 492, 498 (Ala.2008), quoting in turn City of Bessemer v. McClain, 957 So.2d 1061, 1074-75 (Ala.2006))).
Based on the foregoing, there is no room for any conclusion other than that which we reached in Ex parte State: The term “bingo” as used in .Amendment No. 744 means the traditional game of bingo as has been described by this Court. The Cornerstone elements, as since expounded upon in Houston County, are yet again reaffirmed. They are applicable to the term “bingo” in Amendment No. 744, just as they are applicable to the use of that term in Alabama’s other local bingo amendments.
In our opinion in Cornerstone, published over six years ago, we noted certain arguments made by the State at that time. It is surprising, given our opinion in Cornerstone and our opinions in subsequent cases during the ensuing six years, that the following arguments remain germane today:
“ ‘First, there is no question that this case “involve[s] a matter of public importance.” Chapman[ v. Gooden], 974 So.2d [972,] 989 [ (Ala.2007) ].... , “ ‘The issue is before the Court because [the State has] shown that there is no reasonable chance that the machines at issue could be found to be anything other than slot machines, and no reasonable chance that the computer program used to run' them qualifies as the game , commonly known as bingo within the meaning of *844 Amendment 674. A ruling by this Court to that effect would surely put a practical end to this latest effort by gambling interests around the State to make a mockery of this State’s gambling laws .... They prefer to delay, continue to rake in millions during the delay with procedural maneuvers such as those they have engaged in here and in other appeals before this Court, and ultimately pin their hopes on the possibility of political changes which they believe may come with delay.’
[[Image here]]
“ ‘... Despite this Court’s clear, emphatic, and repeated disapproval of every artful attempt to circumvent Alabama’s anti-gambling law, see, e.g., Barber v. Jefferson County Racing Assoc., 960 So.2d 599, 614 (Ala.2006), gambling interests, as demonstrated by this' case, continue to flout those laws.’ ”
Cornerstone, 42 So.3d at 76 (quoting arguments made on- behalf of the State of Alabama).
Today’s decision is the latest, and hopefully the last, chapter in the more than six years’ worth of attempts to defy the Alabama Constitution’s ban on “lotteries.” It is the latest, and hopefully the last, chapter in the ongoing saga of attempts to defy the clear and repeated holdings of this Court beginning in 2009 that electronic machines like those at issue here are not the “bingo” referenced in local bingo amendments. It is the latest, and hopefully the last, chapter in the failure of some local law-enforcement officials in this State to enforce the anti-gambling laws of this State they are sworn to uphold,[18] thereby necessitating the exercise and performance by the attorney general of the authority and duty vested in him by law, as the chief law-enforcement officer of this State, to enforce the criminal laws of this State.[19] *845 And finally, it is the latest, and hopefully last, instance in which it is necessary to expend public funds to seek appellate review of the meaning of the simple term “bingo,” which, as reviewed above, has been declared over and over and over again by this Court. There is no longer any room for uncertainty, nor justification for continuing dispute, as to the meaning of that term. And certainly the need for any further expenditure of judicial resources, including the resources of this Court, to examine this issue is at an end. All that is left is for the law of this State to be enforced.

IV. Conclusion

The trial court’s orders are reversed and a judgment is rendered in favor of the State so that the seized property, including all devices, records, and currency, is forfeited to the State. KCED’s cross-appeal, which seeks relief in its favor beyond that granted by the trial court, is dismissed as moot.
1141044 — REVERSED AND JUDGMENT RENDERED.
STUART, BOLIN, PARKER, MURDOCK, WISE, and BRYAN, JJ., concur.
MOORE, C.J., concurs specially.
SHAW, J., concurs in the result.
1150027 — APPEAL DISMISSED.
MOORE, C.J., and STUART, BOLIN, PARKER, MURDOCK, SHAW, WISE, and BRYAN, JJ., concur.

. The amount of currency stated in the style of this case was a preliminary count that was later revised.

. MCGP owns land and buildings at 8680 County Road 40 in Shorter that it leases to KCED, which operates Quincy’s 777 casino at that location. "VictoryLand” is a trade name of MCGP.

. Additional facts, as applicable, will be provided in the "Analysis” section below.

. Although Judge Shashy did not provide a citation for this quote, it appears as an appendix to In re Arkansas Bar Ass’n, 178 S.W.3d 457, 459 (Ark.2003) (Appendix, Recommendation to Create an Arkansas Access to Justice Commission). Justice Powell’s statement appeared in the context of a recommendation for expanded indigent legal services. The final phrase of the sentence; which the trial court omitted, is “without regard to economic status.” Indigency is not a characteristic commonly associated with those who own and operate gambling casinos. See Hope for Families & Cmty. Serv. v. Warren, 721 F.Supp.2d 1079, 1102-03 (M.D.Ala.2010) (stating that gross profits for VictoryLand in 2007 and 2008 approximated $125 million per year and that payouts to contracting charities did not exceed 1% of those amounts).

. See Houston Cty. Econ. Dev. Auth. v. State, 168 So.3d 4 (Ala.2014); State v. Greenetrack, Inc., 154 So.3d 940 (Ala.2014); Ex parte State, 121 So.3d 337 (Ala.2013); Chorba-Lee Scholarship Fund, Inc. v. Hale, 60 So.3d 279 (Ala.2010);; Riley v. Cornerstone Cmty. Outreach, Inc., 57 So.3d 704 (Ala.2010); Barber v. Cornerstone Cmty. Outreach, Inc., 42 So.3d 65 (Ala.2009); Ex parte Rich, 80 So.3d 219 (Ala. 2011); Surles v. City of Ashville, 68 So.3d 89 (Ala.2011); Tyson v. Jones, 60 So.3d 831 (Ala. 2010); Etowah Baptist Ass’n v. Entrekin, 45 So.3d 1266 (Ala.2010); Tyson v. Macon Cty. Greyhound Park, Inc., 43 So.3d 587 (Ala. 2010); and Macon Cty. Greyhound Park, Inc. v. Knowles, 39 So.3d 100 (Ala.2009).

. In this in rem action. the "accused,” of course, is the seized property alleged to be contraband. This Court has previously held that probable cause existed to issue a search warrant directed at that property. See Ex parte State, 121 So.3d 337 (Ala.2013).

. At trial the court stated that the Equal Protection Clause required the State to either *828 prosecute all violators of a law or else to prosecute none: ”[I]f you're going to do it to one,’ you're going to have to do it to all.... And if you're not going to do it to all, then just leave it, just forget about all of them. You can't pick and choose.” A rule, however, that enforcement of the law in one case is impermissible if other similar illegal activity is not simultaneously suppressed would hamstring the prosecution of all crime. Uniform and comprehensive enforcement of the law is a desirable ideal, but the trial court’s rule, for instance, would require dismissal of charges against a drug dealer if law-enforcement resources were not substantial enough to concurrently prosecute all other such dealers. As the State argues in its brief: "[T]he Constitution does not require the State to stop all illegal activity in order to stop any illegal activity.” State's brief, at 24.

. Alabama does not create or maintain typical legislative-history material such as committee reports and records of hearings.

. The nature and the extent of the limitations imposed by § 65 have been the subject of many opinions by this Court. See, e.g., Opinion of the Justices No. 373, 795 So.2d 630, 634-35 (Ala.2001) (citing William Blackstone and numerous cases to the effect that the prohibition of lotteries .encompasses a wide variety of gambling, including slot machines); Minges v. City of Birmingham, 251 Ala. 65, 69, 36 So.2d 93, 96 (1948)(quoting 34 Am Jur. Lotteries § 6 (1941), to explain that, under the so-called "American Rule" definition of a lottery, “ ‘chance must be the dominant factor,’ ” but that this criterion " ‘is to be taken in the qualitative or causative sense, rather than the quantitative sense’ ”), See also McKittrick v. Globe-Democrat Publ’g Co., 341 Mo. 862, 881, 110 S.W.2d 705, 717 (1937) (explaining the "qualitative sense” to mean that "the fact that skill alone [would] bring contestants to a correct solution of a greater part of the problems does not make the contest any the less a lottery if chance enters into the solution of another lesser part of the problems and thereby proximately- influences the final result"); Horner v. United States, 147 U.S, 449, 459, 13 S.Ct. 409, 37 L.Ed. 237 (1893) (finding it dispositive that the scheme in the case before it was one in which ‘‘[t]he element of certainty [went] hand in hand with the element of lot or chance,” but that "the former [did] not destroy the existence or effect of the latter"); and State ex rel. Tyson v. Ted’s Game Enters., 893 So.2d 355, 374 (Ala.Civ.App.2002) (reviewing substantial authority that, under the “American Rule," "whether a game or activity constitutes a ‘lottery’ depends on whether ... skill override[s] the effect of the chance"), aff'd, 893 So,2d 376, 377 (Ala,2004)) (holding that § 65 prohibits any game "in which skill does not predomi *836 nate over chance in determining the outcome”).

. See cases cited in note 11, infra, as well as the following cases: Ex parte Rich, 80 So.3d 219 (Ala.2011); Surles v. City of Ashville, 68 So.3d 89 (Ala.2011); Tyson v. Jones, 60 So.3d 831 (Ala.2010); Etowah Baptist Ass'n v. Entrekin, 45 So.3d 1266 (Ala.2010); Tyson v. Macon Cty. Greyhound Park, Inc., 43 So,3d 587 (Ala.2010); and Macon Cty. Greyhound Park, Inc. v. Knowles, 39 So.3d 100 (Ala.2009).

. See Houston Cty. Econ. Dev. Auth. v. State, 168 So.3d 4 (Ala.2014); State v. Greenetrack, Inc., 154 So.3d 940 (Ala.2014); Ex parte State, 121 So.3d 337 (Ala.2013); Chorba-Lee Scholarship Fund, Inc. v. Hale, 60 So.3d 279 (Ala.2010); Riley v. Cornerstone Cmty. Outreach, Inc., 57 So.3d 704 (Ala.2010); and Barber v. Cornerstone Cmty. Outreach, Inc., 42 So.3d 65 (Ala.2009).

. Ex parte State, 121 So.3d 337 (Ala.2013).

. See also Ex parte Fontaine Trailer Co., 854 So.2d at 83 (" ' "[T]he Legislature is presumed to have known the fixed judicial construction preexisting [acts] had received, and the substantial re-enactment of such [act] is a legislative adoption of that construction.” ’ " (quoting Wood-Dickerson Supply Co. v. Cocciola, 153 Ala. 555, 557, 45 So. 192, 192 (1907), quoting in turn Morrison v. Stevenson, 69 Ala. 448, 450 (1881))); Ex parte HealthSouth Corp., 851 So.2d 33, 41-42 (Ala.2002) ("Presumably, when the Legislature reenacts or amends [an act] without altering language that has been judicially interpreted, it adopts a particular judicial construction.”).

. In most, if not all, of the cases involving electronic gaming decided by this Court over the past six years,-substantial questions would exist as to whether, even if the machines at issue had constituted "bingo,'' they were being operated for the charitable purposes required by the local bingo amendments at issue in those cases. This Court has not reached this latter issue because the machines have not met the threshold requirement of being “bingo” within the meaning of the local bingo amendment at issue in each case..

. As we explained in Cornerstone, § 45-8-150(1) (applicable to Calhoun County), describes bingo as "[t]he game commonly known as bingo,” which, it states,
" ‘is a game of chance played with cards printed with five rows of five squares each. Participants place markers over randomly called numbers on the cards in an attempt to form a preselected pattern such as a horizontal, vertical, or diagonal line, or all four corners. The first participant to form the preselected pattern wins the game. The term "bingo" means any game of bingo of the type described above in which wagers are placed, winners are determined, and prizes or other property is distributed in the presence of all persons placing wagers in that game. The term “bingo” does not refer to any game of chance other than the type of game described in this subdivision.’
42 So.3d at 79.

. For example, KCED's expert witness conceded that "a game cycle is three to five seconds,” that “human player[s] [are] not required to listen to numbers called and then ■ physically mark a bingo card after each number is announced,” that human players are “not required to pay attention to the bingo numbers or the bingo video grid" in order to win, and that the software plays the game for the player.

. See Appendix to this opinion.

. As noted, even the trial court in this case candidly stated to the deputy attorney general prosecuting this case: “You know as well as I do [local law enforcement,] they're not going to do it, so it comes to [your office].” See discussion supra, Part III.A.l.

. The present case is brought on behalf of the State of Alabama by the attorney general of this State, in whom the law of Alabama vests both the authority and responsibility to ensure the enforcement of the criminal and forfeiture laws of this State, especially when local officials fail to do so. See, e.g., Ala. Code 1975, § 36-15-1.1 ("The Attorney General shall have and retain all of the powers, duties, and authority heretofore granted or authorized by the constitution, statutory law, or the common law.”); § 36-15-1 ("The Attorney General shall ... attend ... to all criminal cases pending in the Supreme Court or Court of Criminal Appeals, and to all civil actions in which the state is a party in the Supreme Court or Court of Civil Appeals. He or she shall also attend to all cases other than criminal that may be pending in the courts of this state, in which the state may be in any manner concerned ....”); § 36-15-21 ("All litigation concerning the interest of the state ... shall be under the direction and control of the Attorney General.”); § 36-15-14 ("The Attorney General, ,.. at any time he or she deems proper, either before or after indictment, may superintend and direct the prosecution of any criminal case in any of the courts of this state.”); and § 36-15-12 ("The Attorney General is authorized to institute and prosecute, in the name of the state, all civil actions and other proceedings necessary to protect the rights and interests of the state.”). See also Riley v. Cornerstone Cmty. Outreach, Inc., 57 So.3d 704 (Ala.2010) (expressly acknowledging the authority and duties of the attorney general based on the foregoing provisions); Tyson v. Jones, 60 So.3d 831 (Ala.2010). Compare Riley, 57 So.3d at 739 ("The power to direct and control normally gives the attorney general the authority to decide what is and what is not worth taking to court or defending there and what is or what is not to be appealed ....”), with Riley, 57 So.3d at 722 (stating that, in the rare circumstance presented in that case, i.e., where both local law enforcement and *845 the attorney general had failed to fulfill their duties for an extended period so that the law making gambling illegal "had gone unenforced in certain counties and that, without action on his part and on the part of those he authorized to act, that law would continue to go unenforced,” the Governor may fill the void left by the inaction of the attorney general and local law enforcement to the extent of taking steps to affirmatively enforce the law, and favorably comparing the rare "circumstances” in that case - to those in State v. McPhail, 182 Miss. 360, 368-69, 180 So. 387, 388-89 (1938)).