PER CURIAM.
The State of Alabama appeals the Greene Circuit Court’s judgment denying its petition for forfeiture of certain electronic-gambling devices and records of Greenetrack, Inc., naming as respondents 825 Electronic Gambling Devices, Greene-track, Inc., Bally Gaming, Inc., Cadillac Jack, Inc., and International Game Technology, Inc. (“IGT”). We reverse the judgment and render a judgment in favor of the State.
Facts and Procedural History
On November 4, 2003, the voters of Greene County ratified Amendment No. 743 (now Local Amendments, Greene County, § 1 (Off. Recomp.)), which provides, in pertinent part, that “[bjingo games for prizes or money may be operated by a nonprofit organization in Greene County.” After the adoption of Amendment No. 743, Greenetrack installed electronic-gaming devices at its facility in Greene County, also known as “Greene-track.”
In December 2008, Governor Bob Riley issued Executive Order No. 44, which created the Governor’s Task Force on Illegal Gambling. Agents of the task force conducted an undercover investigation at Greenetrack to determine whether the machines at Greenetrack were illegal gambling devices. The investigation led the task-force agents to believe that the machines constituted slot machines, which are illegal in Alabama, see § 13A-12-27 and § 13A-12-20(10), Ala. Code 1975. Beginning on July 1, 2010, law-enforcement agents removed from Greenetrack 825 gaming machines, the servers to which the machines were attached, and assorted paper and electronic records of gaming activity, including various documents, computers, and manuals related to the operations of Greenetrack. On August 4, 2010, the State filed an amended petition for civil forfeiture seeking forfeiture of the seized items. On April 11 and 12, 2016, the circuit court conducted a bench trial.
At trial, witnesses for the State presented testimony about the investigation and the seizure of the gaming machines, which were manufactured by Bally, Cadillac Jack, and IGT; the servers; and the records. Lieutenant Mike Reese, a former employee of the Alabama Alcohol Beverage Control Board who worked on the task force, testified with regard to the play of the gaming devices seized from Greene-track. The record provides:
“[Assistant attorney general]: Lt. Reese, with respect to the play of this game, you came up to the machine and you indicated that there [were] certain buttons and other areas on that machine.
“What did you have to do as a player to play this 24 Caret Gold machine?
“[Lt. Reese]: You had to put either cash—cash bills or a voucher into a slot. And it would take it into the machine, it would pull it in, and then it would credit on the screen how much money you put in or depending on whatever you had on the voucher. And the voucher could say $3.40. You slide it in, and it would credit the play for $3.40. And then you would have to start the machine itself.
“[Assistant attorney general]: ....
“Whenever you inserted that into the machine, either the money or the vouch *663 er, what did you have to do next to initiate playing on the machine?
“[Lt. Reese]: You had to start the actual play of the machine by hitting a button. It could be ‘daub’ or ‘play.’ It would say sometimes ‘play daub’ on the same button. You’d have to hit it. And then when you did that, the machine would start operating.

((

[[Image here]]
“[Assistant attorney general]: Now, during the course of playing this game, did you have to take any action while playing the game in any way, form, or fashion?
“[Lt. Reese]: Well, you didn’t have to. Once you started it, if you didn’t want to, you didn’t have to do anything else. But to actually win, you would have to daub it several times.
“What the screen showed in the video, it would tell you and say, ‘Daub now.’ So you would hit the button again. And then after you hit it, it would then stop, the reels would stop on the lower—what we call the player’s plexy. That was where the rails were. It would stop. “[Assistant attorney general]: Now, at any time, did you have any kind of control or ability to change the game or interact inside that game while it was running?
“[Lt. Reese]: No, you did not.
“[Assistant attorney general]: Was it a game of chance?
“[Lt. Reese]: Absolutely.
“[Assistant attorney general]: Any actions that you took, did it determine any kind of outcome of the game?
“[Lt. Reese]: As I said, the only thing you could do is to begin play. And then once you began play, it was solely up to the machine itself whether you won or lost.
[[Image here]]
“THE COURT: Now, one last question.
“If you were distracted and not looking at that machine when it said ‘daub,’ you could sleep your win?
“[Lt. Reese]: Yes, you could.
[[Image here]]
“[Assistant attorney general]: But with respect to these games, I just wanted to differentiate, if I could, any distinctive differences between these games. So if you could tell the Court anything that played differently, that’s fine. But if they all played substantially the same, that’s fine too. ...
“[Lt. Reese]: Yes, sir. They all—they played the same. You had to start the machine by hitting a button, even the one that you had to hit one time. But you had to start with the action of hitting the button and then they would elicit something of value if you won. And it would exert—not cash, but they would exert vouchers that you would then have to either play on the machines or go cash out. So, characteristically, yes, they all played the same.
[[Image here]]
“[Lt. Reese]: Every machine that I observed at Greenetrack all had bingo cards on them. Every one of them. They all played the same. And the people that I watched, including other agents, had to insert cash or vouchers into the machines, vouchers having value on it, and then they played the same way. ...
[[Image here]]
“[Assistant attorney general]: Were you required to look at that 5-by-5 grid in any way to mark it or signify that a number had been called?
“[Lt. Reese]: No, sir, I did not.
“[Assistant attorney general]: Did you hear anyone calling out numbers or values related to the play of the games *664 whenever you were playing these machines?
“[Lt. Reese]: No, I did not.
“[Assistant attorney general]: How quickly did the numbers appear on the screen?
“[Lt. Reese]: Instantaneously. And by ‘instantaneously,’ as soon as you hit the. machine, the ball would drop. Second daub, you could do it like (indicating) and the game would be over in a matter of three seconds.
“[Assistant attorney general]: Were you able to respond in any way whenever the numbers appeared there on the game screen?
“[Lt. Reese]: No, sir, you were not.
“[Assistant attorney general]: Did the machines give you any time to react to one number in any way before the next one was drawn?
“[Lt. Reese]: Well, they were instantaneous. The first three fell at the same time, and then the second batch fell, and it could be 15 to 30 balls instantaneous. You couldn’t mark it one by one. They all fell at the same time.
“[Assistant attorney general]: Were you required to know what kind of pattern you were looking for in playing this game on this machine?
“[Lt. Reese]: You were not.
“[Assistant attorney general]: Were there any players, or did you ever announce bingo?
“[Lt. Reese]: No, sir, I did not.
“[Assistant attorney general]: Did you hear anyone else whenever you were playing the games in the facility announce that they had bingoed?
“[Lt. Reese]: Never.
«
[[Image here]]
“[Assistant attorney general]: ... In playing the game, was there any way to try and signify that you had a bingo, like you had a game-winning pattern when, in fact, you did not?
“[Lt. Reese]: No sir.”
On cross-examination, Lt. Reese stated that the bingo balls displayed on the machines were video representations, that the balls were drawn and would fall electronically, and that the claiming of the prizes was done, electronically. Lt. Reese also stated that if the machine being played did not win the game, the machine would identify numerically the machine that won the game. He explained that when a person initiated a machine and there were not enough machines engaged to play, the machine would post a message stating “waiting for other players,” Lt. Reese further explained that, although the machines of the other players playing the game were identified on a player’s machine, a player could not determine who else was involved in the game. Lt. Reese testified that he believed the machines seized at Greene-track were slot machines.
Greenetrack presented testimony from Richard LaBrocea, Senior Director of Engineering at Gaming Laboratories International (“GLI”). The circuit court certified him as an expert to testify “as to the generally accepted practices, methodologies and protocols for forensic software analysis, compliance testing and classification of, electronic games and amusement devices,” The following excerpt from La-Brocca’s testimony explains the evolution of what he refers to as “electronic marking devices”:
[Greenetrack’s counsel]: Now, when did [cards] give way,. so to speak, to the development of electronic games? When did that occur?
“[LaBrocea]: ... [Actually starting late ’80s, ’90s, you started seeing electronic marking devices making their way into the field. Those devices basically *665 replaced the paper product with a reusable product. That also assisted the players in completing certain aspects of the game.
“[Greenetrack’s counsel]: And when you use the term ‘electronic marking device’ how did they first appear in the ’80s and ’90s, as you described?
“[LaBrocca]: They first appeared as simple portable devices that a player could check out at a bingo hall. Those devices were then given to a player, and they would be not much more than a screen and several buttons that allowed them to view the packet they bought. And the packet would basically be all of the bingo cards for a session of bingo.
“The device itself would bring to the forefront certain elements of the game at a given point in time and allow .the player to advance through that game, aiding him in marking the cards relevant to that particular ball draw.
“[Greenetrack’s counsel]: ... [I]s this what we’ve been referring to as a bingo-minder?
“[LaBrocca]: Yes.
“[Greenetrack’s counsel]: Now, when did bingo-minders evolve into what I call player stations, or upright electronic marking devices?
“[LaBrocca]: There were really two different types of upright marking devices. The first was the portable devices went [sic] to tabletop or desktop versions of them, which is beneficial to facilities that did not move around. Obviously, the portables allowed them to be transitioned from facility to facility, site to site. But there was a risk of losing them, breaking them, dropping them, damaging them, et cetera.
“So for a site that had fixed facilities, they would go to a tabletop version, which was nothing more than the same type as the portable, it was just permanently mounted to a table. That then evolved into what you see today as fully stand-alone, upright physical devices that are, you know, five foot tall and include their own bottom. They’re not necessarily mounted to a table, but have a seat in front of the device itself.”
He explained that each of the stand-alone machines identified with a unique number of other machines playing the same game. He further explained that the'early electronic-marking machines did not require a player to pay attention to the numbers as they were drawn because the player-aid aspect alerted a player that some sort of action would be beneficial to his or her game. LaBrocca testified that a player could “sleep” a bingo using an electronic-marking machine because a player had to recognize that his or her card had a matching pattern and take some physical action to claim the game. According to LaBrocca, the “entertaining display,” i.e., spinning reels displayed on the machines, had no impact on the outcome of the game. He' explained that, even though the machines had a spinning-reels display, each machine also had a representation of a bingo card, the button presses, and the caller board. LaBrocca testified that, at the request of the sheriff of Greene County, GLI tested the machines being played at Greenetrack, determined that they complied with Amendment No. 743, and issued letters of approval for the manufacturers—Bally, Cadillac Jack, and IGT. The record reflects:
“[Greenetrack’s counsel]: Mr. LaBrocca, on the games that GLI examined and certified in this case, did each of the games have a device number that was available to the player?
“[LaBrocca]: Yes.
“[Greenetrack’s counsel]: And where was that available to the player?
*666 “[LaBrocca]: Usually directly on the screen or otherwise printed and affixed to the front or visible surface of the machine.
“[Greenetrack’s counsel]: And is that number different from the bingo game number you talked about earlier?
“[LaBrocca]: Yes.
“[Greenetrack’s counsel]: Now, what is the significance of the unique device number that was available to the player?
“[LaBrocca]: The device number is unique to the physical asset, so this particular terminal—unique idéntifier name, if you will, the bingo game is unique to the instance of play.
“[Greenetrack’s counsel]: On these games, could a player change his bingo card if he didn’t like the card he was displayed?
“[LaBrocca]: Yes. Before staking a wager, you would be able to tap the bingo card and it would cycle through whatever bingo cards were available.
“[Greenetrack’s counsel]: And on these games, are the winning bingo patterns also available to the player?
“[LaBrocca]: They are.
“[Greenetrack’s counsel]: And how are they displayed to the player?
“[LaBrocca]: Depending on the software in question, you would either hit the ‘help’ button or the ‘pays’ button, and you would be able to cycle through all available patterns.
“[Greenetrack’s counsel]: And would the help screen display to the player the winning pattern and the amount of any potential award for matching a particular pattern?
“[LaBrocca]: Yes, it would.
“[Greenetrack’s counsel]: And would that be true for the IGT games, the Cadillac Jack games, and the Bally games?
“[LaBrocca]: Yes.
[[Image here]]
“[Greenetrack’s counsel]: So did GLI verify in its testing and certification in this case that the games offered in the IGT, Cadillac Jack, and Bally games played a common game?
“[LaBrocca]: Correct. If you were enrolled in a game, you both collectively received the same ball draw.
[[Image here]]
“[Greenetrack’s counsel]: Did GLI verify for the Bally games, the IGT games and the Cadillac Jack games that the balls were drawn in random fashion?
“[LaBrocca]: Yes.
“[Greenetrack’s counsel]: Did GLI also determine whether or not the balls were drawn one by one for the Bally, IGT, [and] Cadillac Jack games?
“[LaBrocca]: Yes. We did.
“[Greenetrack’s counsel]: And what did you conclude?
“[LaBrocca]: They were drawn one by one and each selection was random and unpredictable.
[[Image here]]
“[Greenetrack’s counsel]: And finally, Mr. LaBrocca, did GLI also determine that the balls that were displayed to the players on the IGT, Cadillac Jack, and Bally games were displayed to the player one by one?
“[LaBrocca]: Yes.
“[Greenetrack’s counsel]: And what did you determine?
“[LaBrocca]: They were.
[[Image here]]
“[Greenetrack’s counsel]: Did GLI also determine whether the bingo games it tested from IGT, Cadillac Jack, and Bally were communal or competitive games requiring more than one player to play?
*667 “[LaBrocca]: Yes. All three vendors had configurable settings, starting at a minimum of two for the number of players that would be joined into a game.
[[Image here]]
“[Greenetrack’s counsel]: ... Are there differences between slot machines and bingo games, sir?
“[LaBrocca]: Yes.
“[Greenetrack’s counsel]: Can you describe those for the Court?
“[LaBrocca]: We’ve discussed bingo games fairly significantly throughout the last two days. Slot machines, when you’re playing a slot machine, you as the player are playing against a mathematical algorithm singularly, not collectively, against that game. There is no—with people playing that game, there’s no common ball draw at all. There’s no ball draw at all. Instead, what you’re faced with is a wager on a random chance that certain symbols, combinations, cards are going to yield a given prize.
“[Greenetrack’s counsel]: Would it be fair to say that in a slot machine, you’re playing against the house, and in a bingo game, you’re playing against other players?
“[LaBrocca]: That’s true.
[[Image here]]
“[Greenetrack’s counsel]: Mr. LaBrocca, just one more question. In your experience, what are the essential characteristics of the game commonly known as bingo?
«
[[Image here]]
“[LaBrocca]: So I believe it distills down to a group of players competing to be the first to match a predesignated pattern that is selected by a ball drop.”
On cross-examination, LaBrocca testified that the electronic machines allowed a player to increase his or her bets or stakes on a single game of bingo while the game was being played. LaBrocca admitted that the only way to increase a bet when playing in games where the numbers are called one by one and a player physically marks his or her card is by purchasing multiple cards for the same game. He explained that, when a person is playing the electronic games at issue, the wagering is normalized by the system. LaBrocca stated that, although a player is playing in a group when using an electronic device, the value a player may wager on a given card may differ among the players of the game. LaBrocca further testified that, depending upon the machine being played, the amount awarded as the game-ending prize could be a percentage of the total money wagered, and the consolation prizes or interim prizes would not be derived necessarily from the total value of the wager across multiple machines but from house money.
LaBrocca admitted that the players using the electronic devices do not have any kind of meaningful interaction with other players of the game. LaBrocca further testified that a player could, without knowing the pattern needed to win the game, press the button three times to play the game, that there was no way for a player to mark each ball drop individually on the screen, that a player could not mismark an alphanumeric or similar designation of the screen, that the machine, not a person, announced the win, and that a player did not have to shout “bingo” to win the game.
Standard of Review
“When a judge tries a case without a jury, we apply the following standard of review:
“<“[W]hen a trial court hears ore terns testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or mani *668 festly. unjust.” Philpot v. State, 843 So.2d 122, 125 (Ala. 2002). “ ‘The presumption of correctness, however,- is rebuttable and may be overcome where there is insufficient, evidence presented to the trial court to sustain its judgment.’” Waltman v. Rowell, 913 So.2d 1083, 1086 (Ala. 2005) (quoting Dennis v. Dobbs, 474 So.2d 77, 79 (Ala. 1985)). “Additionally, the ore ten-us rule does not extend to cloak with a presumption of correctness a trial judge’s conclusions of law or' the incorrect application of law to the facts.” Id.’
“Fadalla v. Fadalla, 929 So.2d 429, 433 (Ala. 2005).”
State v. $223,405.86, 203 So.3d 816, 822 (Ala. 2016).
Discussion
The State contends that the circuit court erred in holding that the elements of “bingo”—as set forth in Barber v. Cornerstone Community Outreach, Inc., 42 So.3d 65 (Ala. 2009), and elaborated' upon in Houston County Economic Development Authority v. State, 168 So.3d 4 (Ala. 2014) (“HEDA”), to which we hereinafter refer as “the Cornerstone-HEDA elements”— do not apply to the game played pursuant to Amendment No. 743. The appellees contend that because Amendment No. 743 provides definitions for the game of “bingo” and the equipment used to play .the game, Amendment No. 743 .-authorizes electronic-bingo games, and the Cornerstone-HEDA elements do not apply.
Amendment No. 743 authorizes the operation of bingo games by nonprofit organizations in Greene County. Amendment No. 743 defines the game of “bingo” as follows:
“That specific kind of game commonly known as bingo in which prizes are awarded on the basis of designated numbers or symbols on a card or electronic marking machine conforming to numbers or symbols selected at random.”
Amendment No. 743 also defines the “equipment” used in the game, stating:
“The receptacle and numbered objects drawn from it, the master board upon which such objects are placed as drawn, the cards or sheets bearing numbers or other designations'tó be covered and the objects used to cover them or electronic ■card marking machines, and the'board or signs, however operated, used to announce or display the numbers or designations as they are drawn.”
Because bingo is a form of lottery prohibited by Ala. Const. 1901, .Art. IV, § 65, Amendment No. 743 is an exception to the general prohibition in § 65 and, therefore, must be narrowly construed. HEDA, 168 So.3d at 9; Cornerstone. In addition to this fundamental principle of “narrow construction,” we also recognized in Cornerstone the need, “‘except where the language of a constitutional provision requires otherwise,’” to “‘look to the plain and commonly understood meaning of the terms used in [the constitutional] provision to discern its meaning.’” State v. $223,405,86, 203 So.3d at 841 (quoting Cornerstone, 42 So.3d at 79).
Amendment No. 743 itself defines “bingo” as “[t]hat specific kind- of game commonly known as bingo.” In Cornerstone, HEDA, and other similar cases over the past seven years, this Court has held that the unadorned term “bingo” means simply “the game commonly or traditionally known as bingo.” 42 So.3d at 86. In Cornerstone, we explained that this game includes the following characteristics:
“1. Each player uses one or more cards with spaces arranged in five columns and five rows, with an alphanu *669 meric or similar designation assigned to each space.
“2. Alphanumeric or similar designations are randomly drawn and announced one by one.
“3. In order to play, each player must pay attention to the values announced; if one of the values matches a value on one or more of the player’s cards, the player must physically act by marking his or her card accordingly.
“4. A player can fail to pay proper attention or to properly mark his or her card, and thereby miss an opportunity to be declared a winner.
“5. A player must recognize that his or her card has a ‘bingo,’ i.e., a predetermined pattern of matching values, and in turn announce to the other players and the announcer that this is the case before any other player does so.
“6. The game of bingo contemplates a group activity in which multiple players compete against each other to be the first to properly mark a card with the predetermined winning pattern and announce that fact.”
42 So.3d at 86.
In State v. Greenetrack, Inc., 154 So.3d 940, 959-60 (Ala. 2014), this Court considered “the game commonly known as bingo” and the Cornerstone characteristics in light of the definition of bingo provided in Amendment No. 743, stating:
“Amendment No. 743, just like the amendment at issue in [Barber v.] Cornerstone [Community Outreach, Inc., 42 So.3d 65 (Ala. 2009),] and bingo amendments applicable to other counties, speaks of and permits the playing of ‘bingo games’ (provided that a number of other restrictions, including charitable purposes, are met). We identified in Cornerstone and we reaffirm today that the game of ‘bingo’ as that term is used in local constitutional amendments throughout the State is that game ‘commonly or traditionally known as bingo,’ 42 So.3d at 86, and that this game is characterized by -at least the six elements we identified in Cornerstone. Id.
“There is, however, at least one notable difference between Amendment No. 743 and the comparable amendments in most other counties—namely the fact that the ‘card’ required for the playing of bingo may be ‘an electronic marking machine.’ ...
“In Cornerstone, we explained that, among other things, the game commonly or traditionally known as bingo involved ‘each player’ utilizing a ‘card’ with a certain pattern and universe of alphanumeric or other designations and that each player must respond to the random drawings of these designations, by an ‘announcer’ by manually marking this card. 42 So.3d at 86. Clearly, the ‘bingo’ at issue in this case does not employ a ‘card’ in the sense of a flat rectangular or square object made of paper, cardboard, or some similar material on which the required designations are printed. ... [T]he provisions for ‘electronic marking machines’ in .Amendment No. 743 ... allow bingo to be played in Greene County without the necessity of such a card. ...
“The question, however, is whether the ability to employ an ‘electronic marking machine’ obviates all the other criteria of bingo this Court has recognized. Clearly, it does not. By way of explanation, we reiterate and affirm our discussion of Amendment No. 743 in Cornerstone itself:
“ ‘In contrast to the use of merely the term “bingo games,” ... Amendment No. 743 ... legalizes in Greene County a form of bingo that would include an “electronic marking machine” in lieu of a paper card. Even *670 [Amendment No. 743], which is the only amendment in Alabama we have located that makes any reference to the use of electronic equipment of any form, contemplates a game in all material respects similar to the game of bingo described in § 45-8-150(1), [Ala. Code 1975,] .... Amendment No. 743 begins by saying that “bingo” is “[t]hat specific kind of game commonly known as bingo.” The definition then explains that bingo is a game “in which prizes are awarded on the basis of designated numbers or symbols on a card or electronic marking machine conforming to numbers or symbols selected at random.” Moreover, the equipment contemplated by Amendment No. 743 for use in a bingo game is entirely different than the equipment at issue here. Specifically, Amendment No. 743 defines “equipment” for the game of bingo as follows:
“‘“The receptacle and numbered objects drawn from it, the master board upon which such objects are placed as drawn, the cards or sheets bearing numbers or other designations to be covered and the objects used to cover them or electronic card marking machines, and the board or signs, however operated, used to announce or display the numbers or designations as they are drawn.” ’
“Cornerstone, 42 So.3d at 79-80. Clearly, the fact that an ‘electronic marking machine’ can be substituted for a paper card under the terms of Amendment No. 743 does not eliminate the requirement that, in all other respects, the game of bingo permitted by that amendment be the game traditionally known as ‘bingo.’ ”
(Footnote omitted.) See also State v. $223,405.86, 203 So.3d at 839-40 (recognizing that this Court reaffirmed in Greenetrack “that the references to ‘bingo’ in the local bingo amendments, including ... Amendment No. 743 applicable to Greene County, are references to the ‘traditional game of bingo’ and the nonexhaustive list of six elements of that game as set out in Cornerstone” and HEDA and that, although the use of “electronic marking machines” rather than a “card” was permitted in Amendment No. 743, that fact did not eliminate the requirement of the presence of the other characteristics of bingo set forth in Cornerstone and HEDA). We have once again considered the plain language set forth in Amendment No. 743 and adhere to our earlier determinations. The definition of bingo provided in Amendment No. 743 specifically identifies the game as the “specific kind of game commonly known as bingo.” Although Amendment No. 743 permits the use of an electronic-marking machine or electronic-card-marking machine, this allowance does not negate the requirement that the “game commonly known as bingo” must include the other Cornerstone-HEDA elements. As we recently observed in reference to an earlier iteration of this very case: “ ‘[0]ur analysis in Cornerstone is applicable to the other local bingo constitutional amendments in this State.’ ” State v. $223,405.86, 203 So. 3d at 841 (quoting HEDA, 168 So.3d at 18, citing in turn Greenetrack, 154 So.3d at 959 (emphasis omitted)). And as we further noted in State v. $223,405.86:
“This Court is not at liberty, to deviate from the plain meaning of the term ‘bingo’ nor from the principle of narrow construction heretofore noted. It simply cannot feasibly be maintained that Alabama’s local bingo amendments permitting charitable ‘bingo,’ by their repeated use of this same unadorned term in amendment after amendment; communicate an array of different meanings. ... At best, it would be unseemly, and at *671 worst illogical and impracticable, not to mention contrary to a proper understanding of the role of the judiciary, for this and other courts of this State to undertake to attribute some potentially different meaning to each of the 17 local bingo amendments, despite the fact that each of them uses the same language.”
203 So. 3d at 842-43. And, of course, our conclusion here as to the meaning of the term “bingo” is reinforced by the specific reference in Amendment 743 to “the game commonly known as bingo,” the very meaning we have repeatedly extended to “the unadorned term ‘bingo.’ ” 203 So. 3d at 840.
As we stated in HEDA:
“[T]he game traditionally known as bingo is not one played by or within an electronic or computerized machine, terminal, or server, but is one played outside of machines and electronic circuitry. It is a group activity, and one that requires a meaningful measure of human interaction and skill. This includes attentiveness and discernment and physical, visual, auditory, and verbal interaction by and between those persons who are playing and between the players and a person commonly known as the ‘announcer’ or ‘caller,’ who is responsible for calling out the randomly drawn designations and allowing time between each call for the players to check their cards and to physically mark them accordingly.”
168 So.3d at 18. As to the last criterion, we also made clear that the player must pay attention to and respond separately to each value announced as it is called out and that there must be “individual, one-by-one, physical marking of numbers by the player as the game progressed].” 168 So.3d at 15. “Furthermore ... a player who believes he or she has won a game of bingo must declare this fact ‘to the other players and the announcer’ ” by way of a “verbal announcement.” 168 So.3d at 14, 15.[1]
In short, even though Amendment No. 743 permits the use of an “electronic marking machine” or an “electronic card marking machine” in lieu of a paper card, nothing in the plain language of Amendment No. 743 eliminates the requirement of meaningful human interaction and skill by the player when playing the game or any of the other elements of bingo as explained in Cornerstone and HEDA, including the fundamental requirement of a game not played by or within the electronic circuitry of a machine. (Indeed, some of those other elements are specifically contemplated by the bingo-equipment list found in the language of Amendment No. 743 itself.) Therefore, the ■ circuit court erred in holding that the other Cornerstone-HEDA elements do not ápply to bingo as that term is defined in Amendment No. 743.
The State further contends that the circuit court erred in holding that the game played -on the machines seized at Greenetrack satisfy , the .six Cornerstone-HEDA elements. Although Amendment No. 743 permits a player to - physically mark an electric screen rather than a paper card when playing the game, the other Cornerstone characteristics of the game remain the same. State v. $223,405.86, 203 So. 3d at 837.
Our review of the record reveals that the evidence does not support the circuit court’s conclusion that the game played on the machmes seized at Greenetrack satisfy the characteristics of the game of bingo *672 set forth in Cornerstone. Without attempting to note every difference between the Cornerstone-HEDA elements and the characteristics of the machines at issue here, we note the following differences. As to the first element, the evidence demonstrated that the game at Greenetrack did not require a player to mark the alphanumeric or similar designations announced by the ball drop on an electronic screen. As to the second and third requirements, the announcement of the alphanumeric or similar designations was made by the machine, not a human, and was not made one-by-one. Moreover, the automated game did not provide the player with sufficient time to recognize the alphanumeric or similar designation, compare the announcement to the screen, and mark the screen in the appropriate square. Indeed, the evidence established that the alphanumeric or similar designations, which were announced by the drop of balls by the machine, occurred almost simultaneously, preventing a player from recognizing each drop and responding accordingly. Thus, the machine, not the player, paid attention to the announced drops, and the machine, hot the player, marked the screen. As to the fourth requirement, the evidence established that a player could not mismark his or' her screen or affect the outcome of the game if he or she failed to pay attention to the ball drop.[2] As to the fifth requirement, the evidence indicated that a player did not have to recognize any winning or game-ending pattern or orally announce when he or she had achieved the same; rather, the machine recognized the winning pattern. As to the sixth requirement, the evidence established that, even though the machine displayed the numeric identification of the machine of the player who won the game, it was impossible for a player to know whom -he or she was playing against or to -identify the winner of the game. Thus, the- evidence does not reflect, as required by our precedents, including Cornerstone and HEDA, that the player— not the machine—engages- in actual game play. See HEDA, 168 So.3d at 17. Indeed, the evidence, when viewed in its totality, establishes that the electronic machines operated similarly to slot .machines with minimum action from the player-and with an entire game taking no more than a few seconds. Because evidence-establishes that the games being played on-the seized machines do not satisfy the characteristics set forth in Cornerstone, the circuit court’s judgment is palpably erroneous.
Conclusion
In State v. $223,405.86, this Court emphasized, and we now reaffirm:
“There is no longer any room for uncertainty, nor justification for continuing dispute, as to the meaning of [the term ‘bingo’]. And certainly the need for any further expenditure of judicial resources, including the resources of this Court, to examine this issue is at an end. All that is left is for the law of this State to be enforced.”
203 So. 3d at 845.
The circuit court’s judgment is reversed, and a judgment is rendered in favor of the State so that the seized equipment and records are forfeited to the State.
REVERSED AND JUDGMENT RENDERED.
Stuart, Bolin, Parker, Murdock, Shaw, Main, Wise, and Bryan, JJ., concur.

. Our reference in this opinion to some of the characteristics of "bingo'' described by this Court in HEDA is not intended as an abandonment of any of the characteristics not explicitly referenced.

. A player's failure to press a button does not satisfy Cornerstone's fourth characteristic that "[a] player can fail to pay proper attention or to properly mark his or her card, and thereby miss -an opportunity to be declared a winner.” See 168 So.3d at 10, 15.